## PENNSYLVANIA CONSOL. MIN. CO. v. GRASS VALLEY EXPLORATION CO.

## GRASS VALLEY EXPLORATION CO. v. PENNSYLVANIA CONSOL. MIN. CO.

### (Circuit Court, N. D. California.   July 28, 1902.)

### Nos. 12,973, 12,894.

**1. MINES AND MINING—LODE CLAIMS—EXTRALATERAL RIGHTS.**

Evidence considered, and *held* to establish the existence of a vein or lode apexing within the surface boundaries of a mining claim, and having continuity lengthwise of the claim to the extent and in the direction necessary to carry extralateral rights therein between the extended end line planes of the claim, and also to show the continuity and persistence of such vein, in its dip or downward course, extending to the lowest point to which the workings had been carried.

**2. SAME—CONTINUITY OF VEIN IN ITS DIP—"COMPLICATIONS."**

In a lode or vein having its apex in the surface of a mining claim and a westward dip, after it was followed down several hundred feet, and beyond the side line planes of the claim, through which distance it was a comparatively simple fissure vein, there occurred at some points what were technically termed "complications." The fissure would flatten and pinch out, but before reaching that point there would fall from it a series of small mineralized fissures having an eastward dip, and connecting, at a depth downward of six or eight feet, with another underlapping west dip fissure. This latter pinched out in a short distance on its upward course, but on its downward course it strengthened, and became again a strong ore-bearing vein. Wherever these complications occurred, the miners, in the practical working of the mine, dropped to the underlapping fissure, and followed it as the continuation of the main vein in its downward course. The east dip fissures did not appear to cut across either of those having a west dip, but, merely connected them. At other points both north and south of the places where these complications occurred the vein was continuous and unbroken down to the lowest level of the workings. *Held*, that such complications did not break the continuity of the vein, the overlapping and underlapping fissures being portions of the same vein, and that the owner of the claim in which it apexed was entitled to follow it beyond them.

Action in Ejectment and Cross-Action in Trespass.   Tried together by the court without a jury by stipulation.

Lindley & Eickhoff, Fred Searls, and C. W. Kitts, for Pennsylvania Consol. Min. Co.

Garber, Creswell & Garber and A. A. Moore (P. F. Simonds, of counsel), for Grass Valley Exploration Co.

MORROW, Circuit Judge.   The first-named action is in trespass, and was instituted in the superior court of Nevada county of this state on August 6, 1900, by the Pennsylvania Consolidated Mining Company, a corporation organized and existing under the laws of the state of California, against the Grass Valley Exploration Company, a corporation organized and existing under the laws of the state of West Virginia, to recover the value of ore extracted by the Grass Valley Exploration Company from certain underground work-

¶ 2. See Mines and Minerals, vol. 34, Cent. Dig. §§ 75, 77.

ings alleged by the Pennsylvania Company to be in and upon the Pennsylvania quartz vein or lode. The case was transferred to this court upon the petition of the defendant showing that the matter and amount in dispute in the cause exceeds $2,000, exclusive of interest and costs, and that the controversy is between citizens of different states. The second-named action is in ejectment, and was commenced in this court by the Grass Valley Exploration Company on February 16, 1900, against the Pennsylvania Consolidated Mining Company, to recover possession of the quartz vein or lode described in the first action, and embraced within the Pennsylvania under-ground works underneath the surface properties belonging to the Grass Valley Exploration Company. By stipulation the two cases were tried together by the court without the intervention of a jury. By further stipulation, dated April 17, 1901, it was agreed between the parties to the actions that until the court should have tried the issues as to the title, ownership, and right of possession, neither party should be called upon to offer or introduce evidence as to any damage which they or either of them might have sustained by rea-son of the alleged wrongful acts of the other; and that when the court should announce its decision upon said issues, and should de-termine what, as matter of law, were the respective rights of the parties in and to the properties in controversy, and should deter-mine by said decree the ownership of the portions of said proper-ties in dispute, the causes should be referred to a referee or com-missioner to be designated by the court, for the purpose of taking testimony upon the question of damages to which the respective par-ties might be entitled. It was further agreed that the matter in dis-pute exceeds, exclusive of interest and costs, the sum or value of $2,000. In referring hereafter to the parties to these actions, the Pennsylvania Consolidated Mining Company will be designated as the "Pennsylvania Company," and the Grass Valley Exploration Com-pany as the "Grass Valley Company."

The mining ground in controversy in these two actions is located in Grass Valley, in this state. The Pennsylvania Company claims the right to carry on the mining operations in which it is engaged underneath certain surface rights owned by the Grass Valley Com-pany upon the alleged fact that all of its underground workings were made in the orderly pursuit of mining operations in developing, fol-lowing, and extracting ore from a vein or lode the apex of which is within the surface boundary of the claims of the Pennsylvania Company; that such vein or lode is continuous and persistent from its apex at the surface, within the boundary of the claims of the Pennsylvania Company, to the lowest workings in the mine; and, by reason of this fact, that the title to the claim or lode is in the Pennsylvania Company. The surface boundaries of the properties owned by the parties to these actions are shown by the annexed diagram.

The claims designated on the diagram as the "Pennsylvania," "Lib-erty Hill," and "Noon Summer," belong to the Pennsylvania Com-pany. The title of the company to the Pennsylvania claim is de-rived from the United States by a patent dated December 16, 1879,

based upon three mining locations, the earliest of which appears to have been made on August 10, 1870. The Pennsylvania Company is also in possession of the Liberty Hill and Noon Summer mining claims under a contract existing at the time of the commencement of these actions to purchase from parties who derive their title from the United States under a patent dated February 6, 1892. The mining claims designated on the diagram as the "W. Y. O. D.," "Parr,"

"Grant," "Telegraph," "Sims," "Nutall," and "Crescent" belong to the Grass Valley Company. This company is also the owner of the tract designated as the "J. C. Harry Agricultural Patent," to the west of the Pennsylvania claim. It is also the owner of a number of town-site lots in Southeast Grass Valley and the land underlying Empire street, as shown upon the diagram. The title of the Grass Valley Company to the claim designated as the "W. Y. O. D." is derived from the United States by a patent dated February 6, 1893, based upon a mining location dated January 2, 1875. The title of this company to the claim designated on the diagram as the "J. C. Harry Agricultural Patent" is also derived from the United States through a homestead patent issued June 4, 1894, based upon a final homestead entry made by Harry on May 20, 1890. This entry was in turn based upon a settlement on the land made by Harry in 1882. The title of this company to the claim designated on the diagram as the "Crescent" is derived from the United States by a patent dated March 8, 1876, based upon a mining location made on the 21st day of August, 1860. For the purpose of this opinion, the title to the remaining claims, lots, and rights owned by this company need not be here further identified or described. It will be sufficient to say that the location of the Pennsylvania claim holds priority over all the claims, lots, and rights shown on the diagram except the Crescent, and that substantially the claims, lots, and rights of the Grass Valley Company surround the claims of the Pennsylvania Company on all sides.

In determining the rights of the parties to the underground veins and lodes in controversy, we shall have to deal mainly with the surface location of the Pennsylvania claim and its underground or extralateral rights. That claim is described in the patent as being "twenty-eight hundred and thirty-eight (2,838) linear feet of the said Pennsylvania quartz mine, vein, lode, ledge, or deposit." The direction of the length of the claim or location containing this vein or lode is described as N., 10° 45′ E., and correspondingly in the reverse direction as S., 10° 45′ W. The end lines of the location across the vein or lode are parallel, having a common direction of N., 79° 15′ W., or correspondingly in the reverse direction S., 79° 15′ E. The surface area of the location is 16.44 acres. The extralateral rights of the veins or lodes of this location under section 2322 of the Revised Statutes of the United States are described as "for the length hereinbefore described, throughout its entire depth, although it may enter the land adjoining, and also of all other veins, lodes, ledges, or deposits throughout their entire depth, the top or apex of which lies inside the exterior lines of said survey at the surface, extended downward vertically, although such veins, lodes, ledges, or deposits in their downward course may so far depart from a perpendicular as to extend outside the vertical side lines of said survey." The survey referred to in this description is the survey made by or under the direction of the United States surveyor general, in accordance with the requirements of section 2325 of the Revised Statutes of the United States.

The questions presented for determination are mainly of fact, and

relate: First, to the existence of a vein or lode apexing within the surface boundaries of the mining claims owned by the Pennsylvania Company; second, the continuity of the apex of such vein or lode to the extent and in the direction necessary to embrace within extended end line planes the vein or lode in controversy; third, the continuity and persistence of such vein or lode on its dip or downward course from its apex to the lowest point of the vein or lode as developed or worked by either party, and including the ore deposits in dispute.

The existence of a vein or lode apexing within the surface boundaries of the mining claims owned by the Pennsylvania Company is not denied by the Grass Valley Company. The controversy commences with the question as to the continuity of such vein or lode dipping to the west to the extent and in the direction necessary to embrace within extended end-line planes the vein or lode in controversy outside the west side line of the Pennsylvania claim. The Pennsylvania Company claims that it has a vein apexing at or near the surface, and within the boundaries of the Pennsylvania claim, dipping to the west, substantially to the extent and in the direction along the length of the claim as shown by the red line in the annexed diagram. [See diagram entitled "Pennsylvania Exhibit No. 2," printed in colors.]

The Grass Valley Company contends that the Pennsylvania Company never had an apex vein running continuously or approximately so lengthwise within its location across either end line; that it never had an apex vein that did not cross both side lines of the location; that the so-called apex vein, where it did exist, was made up of a series of apexes of veins whose projections would cross the side lines of the Pennsylvania claim. The contention of the Grass Valley Company is illustrated by the annexed diagram. [See diagram entitled "Apex Map G. V. Ex. Co. Exhibit B," printed in colors.]

The Pennsylvania quartz claim appears to have been discovered by John Cadden at or prior to August 10, 1870, when the first location was made by him. This location, together with two others, one north and the other south of the original discovery claim, were incorporated into the Pennsylvania quartz claim, for which a patent was issued by the United States to the Pennsylvania Company on December 16, 1879, for 2,838 linear feet. The north end of the claim for a distance of 627 feet south from the north end line and the south end of the claim for a distance of 1,221 feet north from the south end line is 198 feet wide. The middle section of the claim, 990 feet in length, is 320 feet wide at its narrowest point, and 445 feet at its widest point. The surface opening of the present working shaft of the Pennsylvania Company is approximately 1,000 feet south from the north end line of the claim. The shaft descends into the earth following substantially the dip of the vein at an incline of about 30° to the west. The point of discovery and the first work of any consequence done upon the vein was at a point about 100 feet north of the present shaft. This work was along the vein for a distance of about 200 feet north, the vein dipping to the west. The shaft of the Grass Valley Company is located in the W. Y. O. D. claim, patented Feb-

ruary 6, 1893. This claim is east of the Pennsylvania claim, and is approximately 1,500 feet in length, running nearly north and south along the W. Y. O. D. quartz vein or lode, and contains 16.24 acres. The elevation of the collar of the Pennsylvania shaft is 2,550.39 feet, and that of the Grass Valley shaft 2,545 feet, above sea level. The bearing of the collar of the Pennsylvania shaft from the collar of the Grass Valley shaft is N., 22° 45′ W., and the distance between the two shafts at the surface is 1,005 feet. James Burke, a witness called on behalf of the Grass Valley Company, testified upon the trial that he had known the Pennsylvania location since 1871, and had worked from the surface down to the 300-foot level. He testified that the vein had croppings on the surface, that these croppings were exposed for a distance of from 15 to 20 feet, and that the direction of this apex vein was supposed to be north and south. He also testified that a shaft was run by Cadden about 100 feet north of the present incline shaft of the Pennsylvania Company. Recent explorations by the Pennsylvania Company north of the shaft and in the direction of the north end line of the claim have disclosed continuous old workings near the surface, commencing at a point about 100 feet north of the present shaft, and running thence northerly for a distance of about 200 feet, indicating the existence of a vein at one time apexing at or near the surface, and conforming substantially to the line between the point marked "14A" and a point about 50 feet south of the point marked "17," as shown by the Pennsylvania Exhibit No. 13. [See diagram printed in colors.]

These recent explorations by the Pennsylvania Company have also been extended in a northerly direction by cuts and shafts at intervals following the strike of the vein running a little west of north to the north end line of the claim, where the vein passes out of the claim on its strike a little west of north. At several points in these explorations old workings upon the vein were encountered, indicating that at an early date this vein had been found and explored near the surface. These old workings, together with those first named, extended along about 40 per cent. of the explored distance. The vein thus exposed has a general strike in a northerly direction and a dip to the west. Returning to the point about 100 feet north of the shaft of the Pennsylvania Company, and proceeding south in front of or to the west of the Pennsylvania Company's hoisting works, we find no surface explorations of a recent date until we reach a point about 80 feet south of the shaft, where we find what is called the "south air shaft." For this distance of about 180 feet the Pennsylvania Company has endeavored to establish the continuity of the apex vein by showing the existence of old stopes and drifts upon the vein underground running north and south.

Ross E. Browne, an expert mining engineer, called by the Pennsylvania Company, testified that he was employed by that company in March, 1900, to make an investigation and direct exploration work at the mine. He had been employed off and on for a little over a year, and had expended probably 90 days on the ground. After testifying that he had by such work traced the Pennsylvania vein from the northerly end line of the claim at point No. 1 to point No. 16,

as shown on the map "Pennsylvania Exhibit No. 13," he testified as follows, referring to "Pennsylvania Exhibit No. 2":

"From point 16, which then becomes a point of the Pennsylvania apex, on to the south, I was unable to do any work conveniently on the surface for the purpose of establishing the apex, owing to the fact that that ground is covered by old dumps, and is mostly made ground. The original ground is not there near to the surface, but by going from point 16 down the north air shaft towards the 100 level we encounter in a short distance the apex of the vein at a point between 16 and 17. I thence follow old stopes down this shaft for a considerable distance. Then pass through a short space of ground in place, showing the vein in place, with considerable quartz in it. Thence again along the edge of old stopes all the way down to the 100-foot level. From the 100-foot level, a point that we strike the 100-foot level going to the south, we follow continuous vein, partly stoped, practically all the way to the Pennsylvania shaft. At a point opposite to the east crosscut, which is shown on the model, and is marked 'Station 111,' I passed downward through the old stopes, along the edge of the old stopes [referring to stations marked on model Pennsylvania Co. Exhibit No. 4], through 201, 202, 203, to 204, on the 200 level, following the vein all the way; from 204 to the south, passing through the shaft, follow the vein all the way, to 216. From 216 the vein is followed by the south air shaft all the way out to the surface at station 18. Station 18 then makes a second point of the apex, and from station 16 to station 18 the apex is constructive. Mr. Lindley: Q. That is, at the surface? A. At the surface. That shows—this tracing that I made down the north air shaft through the 200 level to the south and up the south air shaft—shows that the point 18 is a point of the apex of the same individual vein that the point 16 represents. Q. In other words, instead of tracing on the surface, on account of the existence of artificial ground and the dumps, you passed underneath the surface, and followed around the 100 level to the south air shaft, and thence to the surface again in 18? A. Yes, sir. I did not make the tracing on the 100, because there is a small gap in it, but I went down to the 200 to make the tracings, so as to leave no gap in the continuity of the vein development."

The surface having been worked out many years ago, and the ground covered by dumps of rock and other refuse accumulations usual in the vicinity of hoisting works, it was clearly impracticable in the recent explorations to establish the apex of the vein as a physical fact upon the surface along the line between the points mentioned. It was, however, unnecessary. The underground stoping between the 100 and 300 foot levels running north and south furnishes satisfactory, and, indeed, the best, evidence of the existence of a vein reaching near the surface of the line of the projected apex. From the south air shaft further explorations south were continued by Mr. Browne underground. He says:

"Now, from the point 129 on the 100 level [referring to station marked on model Pennsylvania Co. Exhibit No. 4], extending to the south from point 18, the tracing on the surface cannot be made, owing again to artificial ground; that is, the original ground in place has been covered over by old dumps, so that the tracing cannot be well made. There are buildings there as well, the foundations of which cannot be interfered with. Consequently, attempting to follow the vein or establish approximately the apex of the vein from that point to the south, I followed the 100 level to the south from station 129, through station 130, to a point marked on the surface map (Pennsylvania Exhibit 3) about 30 or 40 feet south of station 20. There is no number there. Q. On Exhibit No. 3? A. On Exhibit No. 3. That is as far south as I traced the vein continuously. Mr. Moore: Q. What is that number? A. That number is not given. It is a point immediately east of the sand plant, and about 30 or 40 feet south of station 131 on Exhibit No. 3."

The distance underground was about 150 feet, establishing a projected apex upon the surface for the same distance. From the end of this projected apex upon the surface Mr. Browne traced a vein on the surface from point 21 through 22, 23, 25, 27, 28, and 29, by means of shallow pits and open cuts showing a fairly good vein, which he assumed was the Pennsylvania vein. The distance on the surface from point 21 to 29 is about 300 feet. This apex vein as thus traced has a length of about 1,450 feet, 1,120 feet traced upon the surface and 330 feet traced under ground, all within the boundaries of the Pennsylvania claim, running in a direction corresponding generally to the length of the claim. The Grass Valley Company contends that no such continuous vein apexing within the boundary of the Pennsylvania claim has been found, but that what has been found may be termed a series of intersecting veins, which may be approximately illustrated by the annexed diagram. [See "Diagram AA," printed in colors.]

If this contention of the Grass Valley Company is correct, then the Pennsylvania Company has no extralateral right to the ore deposit in controversy to the west of the Pennsylvania west side line, but the same belongs to the Grass Valley Company under its common-law right to everything beneath the surface covered by its agricultural patent granted to Harry. The claim of the Pennsylvania Company to this extralateral right does not appear to have been questioned until the year 1900, when the underground works of the Pennsylvania Company had been extended some distance beyond the west side line of the Pennsylvania claim and under the Harry ranch. But even in this aspect of the case the burden rests upon the Pennsylvania Company to establish its right to the vein under the surface of the adjoining proprietor. The history of this controversy between these two companies was told upon the trial by W. S. Keyes, the well-known mining engineer. After giving an account of his different employments and experiences as a mining man, mining engineer, and mining manager, he said:

"I am also at present consulting engineer and a director in the Grass Valley Exploration Company. Some year and a half ago, or I think a year ago February, or something like that, we came to the conclusion that the Pennsylvania Company were trenching upon our premises, and we started a suit. When I first was employed as consulting engineer for this company, I made a study of the underground formation. I arrived there in the early days of the month of December, 1898. I spent some two weeks there in a careful study of the maps and underground works of the company, as careful as was possible in that time, and discovered that our principal fissures were making off to the northwest. We were already outside of our territory. I was perfectly well aware that, if projected up in their own directions, the principal fissures, after leaving the W. Y. O. D. proper, would certainly, some of them, go across our side lines, if projected in their own directions. I therefore advised my fellow directors to buy up all the surrounding territory. It took much time and money to acquire the property which you now see there outlined to the west in blue. We were in mortal terror that the Pennsylvania Company would find out what we were about,—would suspect that we were afraid that our mine was going outside of our limits, which it would certainly do if our principal fissures would continue in the same direction. Mr. Moore: Q. What properties do you refer to? A. All these surrounded by blue there, the exterior limits of

which are marked on the map Exhibit A. [See diagram entitled "G. V. Ex. Co. Exhibit A," printed in colors.] You will observe that there is a large space in the middle, which is the Harry ranch. You will observe that both shafts,—the bottom of both shafts,—are beneath that surface. We bought that Harry ranch. After we had bought it, we found out to our dismay that the owner of the ranch had already sold the mineral rights, so we had to go and buy it over again. We then gradually purchased the Crescent, and the New York, and various mineral rights underneath the surface, as indicated upon the map Exhibit A. After we acquired sufficient property to the west, I advised my fellow associates that it was time to begin with the Pennsylvania, and we began. We have worked upon these developments from that time continuously ever since. At the time of the inauguration of this litigation I was retained in four different mining suits. In view of the fact that it was unlikely that I should be able to attend to the details of this litigation, Mr. Janin was selected to dig out the details, which, with his assistants, you see what has been accomplished to-day. I was not aware at that time, nor until Mr. Janin and his assistants had dug it out, that there was any such thing as a northeasterly series of fissures. Q. What did you believe them to be? A. I believed that there was one vein there. Q. Well, with what course or direction or strike? A. I believed that the principal vein then was northwest and southeast, as the developments have since shown. Without anticipating, I will simply, in answer to the question, state that to the eye it is plain enough that, if this be but one fissure, as I then supposed it to be, it certainly, as it goes down in depth, warps off to the northwest, and that brings me down to the position where we are at present."

In this connection it is pertinent to state that the first suit in this litigation was brought by the Grass Valley Company against the Pennsylvania Company on February 16, 1900. Upon cross-examination Mr. Keyes testified as follows:

"Mr. Lindley: Q. I understood you to say in your direct examination that your original understanding of this formation was that there was a single fissure in the W. Y. O. D.? A. Yes, sir. Q. When did you get your revelation that there was more than one? A. After Mr. Janin and his assistants had dug out the facts. Q. How long was that after you became consulting engineer of this mine? A. It was probably within a year. Q. During all that time you had been through the mine as the consulting engineer of the company? A. Yes, sir. Q. As far as its workings northerly have been projected? A. I had. Q. Had you ever been in the Pennsylvania mine up to that time? A. I had not. Q. Did you ever ask permission to go in? A. I did not. I went in with our party under the understanding we were permitted to go. Q. I mean prior to this litigation. A. I did not. Q. Prior to your discovery that there was more than one vein? A. I did not. Q. How many veins do you now say there are in the W. Y. O. D.? A. Two systems. Q. Well, how many distinct veins? A. I should say that there were—in the Pennsylvania? Q. In the W. Y. O. D. A. In the W. Y. O. D. I would say that there are two or three, perhaps four, parallel sheetings to the northwest series, and parallel to the northeast series. Q. Have the joint planes anything to do with those veins? A. I don't think they have. Q. While you agree with Mr. Janin's results as to being more than one vein, you disagree with him as to the joint plane business? A. Allow me to explain. Mr. Janin has evolved a theory to account for these fissures. He has spent a great deal of time upon it, and it may serve to account for the fissures. I have a great respect for any theory enunciated by Mr. Janin. I have not had time enough to prove or to disprove, reject or to accept, his conclusions. Q. You do accept his conclusions, because you say you originally were a one-vein man, and that you were converted by Mr. Janin's investigation of the facts? A. I was converted by the result of Mr. Janin and his assistants' examination of the facts as apparent in the ground. Q. Then you are testifying as an expert here upon the examination of Mr. Janin and his assistants? A. I am testifying upon the facts as dug out by these gentlemen. Q. You were the consulting engineer of the company for over a year before Mr. Janin came there? A. Yes, sir. Q. And you did not dig out any? A. Not till these facts were finally determined. Q.

These facts you speak of, are they facts that would come to the observation of an ordinary miner? A. Perhaps yes, and perhaps no. Q. What is your candid judgment about that? You did not discover it for a year, and you are no ordinary miner. A. I am much obliged. I don't think he would. Q. Is it not a matter of fact that the miner in these two mines has gone on regardless of all ideas of intersection,—he has followed the ore body? A. Unquestionably he has. The fact is, the superstition has existed that the fissures were north and south. As a matter of fact, the miner follows his ore where he finds it, and as a matter of fact in this mine the miners have followed off on one at least or more of these northeasterly fissures. He followed where the ore was, and, although the belief has existed for many years that there was but one there, we find to-day that there are two."

We have here in this testimony of an expert engineer and a practical mining man, who is familiar with the district in which these mines are located, the statement of four important facts to be considered in determining the course and direction of the Pennsylvania apex vein upon the surface: First, that prior to the year 1899 it was the belief of practical miners that but two veins existed in the W. Y. O. D. and Pennsylvania claims, one in the W. Y. O. D. and one in the Pennsylvania; second, that these two veins or fissures ran in a general direction north and south, or, to be more accurate, northwest and southeast; third, that in the year 1899 a discovery is claimed to have been made by Mr. Janin, the expert engineer, that there was another series of veins in these claims, running northeast and southwest; fourth, that prior to this supposed discovery of the second series of veins the right of the Pennsylvania Company to follow the Pennsylvania vein on its dip to the west or to the south of west had not been questioned. The testimony of the witnesses who had traced this apex vein by means of cuts and shafts at intervals along the surface is too much in detail to be repeated here. It is sufficient to say that, in my judgment, it establishes the course and direction of a single vein, as shown by the diagram "Pennsylvania Exhibit No. 2." The claim made by the Grass Valley Company that there were other veins apexing within the side lines of the Pennsylvania claim running in substantially the same direction, and that these veins were crossed by still other veins at more or less obtuse angles, giving the general appearance of a single vein for the entire distance, was met by explorations made during the trial by the Pennsylvania Company by means of box trenches at points claimed to be crossings. In my judgment, this evidence demonstrated the existence of nothing more than a main vein with projected seams or spurs at these points. These seams or spurs were not traced for any distance, and were not found crossing any side line of the Pennsylvania claim. Whatever these seams or spurs may be called, or to whatever extent they may have been found, they did not destroy the continuity of the main vein. These crossing seams were called by the Grass Valley Company "transverse veins," and were described by Mr. Kerr, a mining engineer, and general superintendent of the Grass Valley Company, who was called as a witness for that company. He said that the veins intersecting the main vein were transverse veins. "Any vein," he said, "that has a dip opposite the regular west dipping veins, are transverse veins. It makes no difference whether they dip to the east, to the southeast, or to the south; so long as they

dip in an opposite direction from the regular vein which we have in this vicinity, which are the west dip veins, we call them the transverse veins." This witness endeavored to establish at least three of these transverse veins at the surface of the Pennsylvania claim by projections from the strike of the stopes in the workings of the mine below, but in every instance these projections failed to conform to anything claimed as a transverse vein upon the surface. It will be further observed that Mr. Kerr admits that the west dipping vein in this vicinity is the "regular" or "main" vein. This, in my opinion, is an important fact, which of itself tends most strongly to establish the continuity of the Pennsylvania vein.

But what was the nature of the discovery made in the year 1899 that in the judgment of Mr. Keyes established the fact that there is a second series of fissures in these two mining claims? The discovery is attributed to Mr. Louis Janin, the expert mining engineer and mining geologist. He was called as a witness by the Grass Valley Company, and testified fully upon the subject. In brief, his statement was that he had found in these two mines and in other places a rhombohedral structure of the granite and grano-diorite, and that the dislocations in the joint planes of such structure would open transverse fissures. Mr. Janin illustrated his views of this character of rock structure by models, pictures, and diagrams, and by an elaborate geological exposition that was exceedingly interesting; but his theory of rhombohedral rock structure did not necessarily establish the persistence and continuity of any or any number of transverse fissures in the Pennsylvania claim. In other words, his theory might be true, but in a given mass of granite or grano-diorite there might be only one continuous opening of successive joint planes, or there might be one continuous opening through disjointed planes. In either case a vein filling the fissure and reaching the surface would expose but one apex. This fact was well stated by Mr. Janin himself in the course of his examination, as follows:

"Q. The formation of the structure of rock into the rhombohedron form does not necessarily determine that there will be a number of veins? A. No, sir; far from it. Q. The pressure may make the line of least resistance simply one vein to the surface? A. It might be to one vein. Q. But it would follow the lines of the rhombohedron structure? A. Yes. It would follow on the face of the rhombohedron."

The court is of the opinion that the evidence establishes the existence of a vein or lode apexing within the surface boundaries of the Pennsylvania claim, and that there is a continuity of this vein or lode lengthwise of the claim to the extent and in the direction necessary to embrace within extended end line planes the vein or lode in controversy.

The remaining question is, has this vein or lode such a continuity and persistence in its dip or downward course as to include the ore deposit in dispute? For the purpose of illustrating the position, extent, and direction of the Pennsylvania vein and its relation to the W. Y. O. D. vein, together with the shafts, levels, drifts, winzes, upraises, stopes, and other works of these two mines, and their relation to each other underground, two models were introduced in evidence, one provided by the Pennsylvania Company, and marked "Exhibit 4"; the other by the Grass Valley Company, in two sections,

the first representing the W. Y. O. D. mine and its works, marked "Exhibit P," and the other representing the Pennsylvania mine and its works, marked "Exhibit Q." The two models represent in reduced form the spaces from which ore has been taken, the ore deposit in dispute, and the works in the two mines in such necessary detail, designated by numbers, as to inform the court, in connection with the maps, charts, diagrams, and evidence of engineers, experts, and practical miners, concerning the available facts in the case. Taking the Pennsylvania shaft for an initial point, as shown on the model Exhibit No. 4, and as explained by the evidence, we find from the surface down to the 100-foot level but one shaft. At the 100-foot level the shaft is divided into two shafts, designated as the upper and lower shafts. Between the 300 and 400 foot levels the upper shaft is divided into two shafts, designated as the upper and middle shafts. The vein between the 100 and 300 foot levels maintains practically a uniform and regular dip and strike, and the present stopes indicate that the ore shoot was from 200 to 300 feet wide. As the vein descends from the 200-foot level, it passes through the perpendicular side lines of the Pennsylvania claim, and at the 300-foot level it is wholly to the west of such side lines. Between the 300 and 400 foot levels, just above the point of division between the upper and middle shafts, the shaft passes through the vein at a point designated as the "Chicken Coop," where the Grass Valley Company contends the continuity of the Pennsylvania vein is broken, or at least that it passes upward, and has not been followed. But to the north of the shaft, and on the same horizontal plane, the continuity of the vein is unbroken, and the vein followed down through stopes to the 400 and 500 foot levels. At this last level stopes are found returning north, and across the middle shaft, descending to the 600-foot level. The stopes at the 500-foot level extend north and south about 250 feet, indicating that the vein preserved its continuity to the north as it descended through the 600 south stope and the 600 stope to the 600-foot level. Still further to the north we find a stope designated as the "600 Underlap Stope." This stope is connected with the 600 stope, and in turn it is connected with the 600 north stope. Following down this latter stope, we come to the intermediate north stope, and following this stope around and over a stope designated as the "Hogsback," we reach the intermediate stope, and descend by the 700 north stope to the 700-foot level. Returning to the 600-foot level, we may descend by the stope designated as the "Intermediate Stope" directly to the 700 north stope and the 700-foot level. Down to this point we have descended by continuous stopes, indicating the original continuity of the vein from the surface to the 700-foot level by the course indicated. But at three or four other points this continuity has not been found, and connections between the upper and lower portions of the same vein, as claimed by the Pennsylvania Company, or between different veins, as claimed by the Grass Valley Company, had been made by stepping down at different places a distance of from 6 to 8 feet through country rock. These disconnected sections were designated on the trial as "complications," and the use of this term will be continued in this opinion. One of these complications was shown on the model

Exhibit 4 just below the 300-foot level, between the stations marked "401" and "402," where the vertical distance between the seams was 6 to 7 feet. Another was shown below the 400-foot level at station 640½, where there were two drops of 7 or 8 feet each. South of the shaft another route is found from the surface to the 700-foot level, descending through continuous veins and stopes, except at one point marked on the model as "Station 770½," where there is a vertical drop of 7 or 8 feet. These complications disclose east-dipping seams, which the Grass Valley Company claims belong to independent transverse fissures, but which the Pennsylvania Company claims are vein connections between overlying and underlying sections of west-dipping fissures. The following figure will illustrate the claim of the Pennsylvania Company as to these connections:

"B" EXHIBIT 10

The testimony of Ross E. Browne explains these connections as follows:

"In the case of the Pennsylvania vein we have the complexity of fissuring. There is also some ore in the included masses of country rock, due to impregnation. These masses have been altered and softened by percolating waters, and are traversed by many small fissures filled with ore-bearing material, constituting irregular ore bodies. There are no complications in the Pennsylvania vein in other respects. There is no complication due to displacement or faulting. The original continuity of the fissuring is still maintained. There are no complications due to the intersection of veins. All branches are apparently contemporaneous in origin, and when they come together they form junctions like the confluence of the forks of a river. A possible exception to this rule may be noted in connection with the so-called crossings. They constitute a series of small, almost vertical fissures crossing and cutting through the east and west dip fissures on entirely contrary courses. They are small and barren as a rule, carrying frequently a little clay, and rarely a little quartz. In no case that I know has one of them been mined for ore in the Pennsylvania mine. Their effect on the vein is somewhat obscure. They do not fault the vein, but frequently the vein bends and steepens a little in passing through them. I shall not attempt to attach any significance to these crossings. The country rock of the ground in dispute is wholly grano-diorite,—a rock very similar to granite. For all practical purposes we may call it granite, as the miner does. We may then add that there are no complications due to changes of formation. The Pennsylvania vein may now be defined as the filling of a complex of interconnected fissures in a homogeneous mass of country rock; the various parts being of contemporaneous origin, and culminating in a common apex. This vein apexes and continues downward several hundred feet as a comparatively simple fissure vein. Thence downward it grows more complex, but persistently maintains its identity. It is apparently more simple again on the bottom level. The term 'common apex' requires explanation in connection with my designation of this complex mass as a single vein or lode. Referring to the red color on the model, representing the Pennsylvania vein, I am strongly of the opinion that, starting from any important point of development on the lower levels, a branch of the vein is traceable upward

along a continuous line of mineralization, or of vein matter, through under-laps, east dippers, and overlaps, to the Pennsylvania apex. It is not always possible to make such tracing through the present openings. There would be required a ruinous amount of deadwork to enable such a thing; but the continuity is pretty generally indicated where the development is wanting. There are many fissures or seams departing from the main line of ore bodies on divergent courses. These weaken and pinch out, or, if not suffi-ciently developed to exhibit this as a fact, the indications are definitely that way. These departing seams most commonly dip downward; or, if they start upward, they are apt to turn over, and ultimately dip downward. Still there are doubtless some of these seams which persist in an upward course, and, dying out in the country rock, have blind apices of their own. I must therefore explain that in speaking of the apex of the vein I treat these as insignificant offshoots or spurs, and not as separate branch veins. These east dippers or east droppers have about the same strike as the west dip fissures, but a contrary dip. They characteristically connect two west dip fissures without cutting across either. They flow from one to the other. In no case that I have seen do these east dippers cut through a strong overlap or underlap west dip fissure. A striking feature of this mine is the part these east dippers take in leading to a stepping down from an overlapping to an underlapping west dip fissure. It is an unusual occurrence, so far as my experience goes; but there is nothing strange about it, any more than in many other cases. It is the natural result of the lines of weakness and the lines of strain; hence the lines of fissuring in this par-ticular section. There are certain sections of the mine where, if we follow the main fissure downward on its westerly dip, we find it flattening, weaken-ing, and pinching out; but before pinching there fall from it a series of east dip fissures which connect below with an underlapping west dip fissure. This underlap flattens, weakens and pinches out on its upward course, but on its downward course it strengthens, and becomes a strong ore-bearing vein."

The witness here illustrated his statement by a drawing, "B, Ex-hibit 10," set out on the preceding page, and continued:

"This overlapping west dip fissure on its downward course flattens, weakens, and ultimately pinches out, but before pinching out there fall from it a series of east dip fissures, which connect below with an under-lapping west dip fissure. This underlapping west dip fissure, if we follow it on its upward course, flattens, weakens, and pinches out. If we follow it on its downward course, it strengthens, and becomes again a strong ore-bearing fissure. That is characteristic of the Pennsylvania mine,—some of the sections of the Pennsylvania mine. This, as I have stated, is an unusual occurrence,—this stepping down by such a system as that. There is a method of stepping down that is very well known in connection with veins, and that is by a system of step faulting. But the case we have in hand, although perhaps somewhat similar in effect, is very different structurally. There is no faulting in the Pennsylvania section, no displacement of the country rock. The channel through which the mineralizing solutions passed is simply complicated by this network of fissures. Its continuity as a channel is not disturbed. The continuity of the vein is definitely maintained. Re-garding the theory of the formation of these veins, the country rock was first fissured and fractured. Some of the fissures reached to great depth, and tapped a deep-seated source of mineralization, from which solutions arose, circulated through the fissures, deposited the quartz with its gold contents, and finally escaped to the surface. Once conceive the mineraliza-tion to be due to the circulation of solutions through the open channel pre-pared by the complex fissuring, and there is no more difficulty in recogniz-ing the complex than the simple parts of the vein as a unit. Concerning this unity, it seems to me the only legitimate question is, do these inter-connected parts apex separately or together? I have already expressed my opinion in the matter: they join and apex together."

This vein connection described by Mr. Browne between the west dipping fissures through east dipping seams or fissures, is confirmed

by a number of other witnesses. But against the sufficiency of this evidence to establish the continuity of the Pennsylvania vein the Grass Valley Company contends that the east dipping fissures pass on, and constitute an independent series of transverse fissures, breaking the continuity of the Pennsylvania vein on its dip to the west. The answer to this contention is found in the fact that the continuation of the east dipping fissures has not been satisfactorily established at any point where the two veins have come together; while, on the other hand, the Pennsylvania Company has prosecuted its work on the main west dipping vein, finding the continuity of this vein beyond the point of the east-dipping connections, and this has been the work of the practical miner following the main vein in its downward course. To my mind, the most conclusive fact establishing the continuity of the Pennsylvania vein is this fact that the vein can be followed as a dominant persistent vein from the surface through continuous stopes down to the lower workings of the mine.

When suit was commenced by the Grass Valley Company against the Pennsylvania Company in February, 1900, the Pennsylvania Company had reached the 700-foot level of the mine. As has already been stated, this suit was based upon the discovery made by the Grass Valley Company that the principal fissures of the W. Y. O. D. mine were making off to the northwest. The W. Y. O. D. vein apexes about 500 feet east of the Pennsylvania vein, and the W. Y. O. D. shaft is about 900 feet south of the Pennsylvania shaft. The discovery as to the direction of the principal fissures of the W. Y. O. D. vein appears to have been made in driving north and northwest the 800-foot level of the W. Y. O. D. mine. In time that level reached a point beneath the Pennsylvania works, and the Grass Valley Company proceeded to take ore from that section. The workings of the two companies eventually came together at a number of different points below the Pennsylvania 700-foot level. Below this level other complications occur in the vein, and the Grass Valley Company again contends that the Pennsylvania vein has been cut off by east dipping fissures, and that the vein no longer retains its continuity, whatever may have been its fate above.

We have now reached the most important feature in this case, namely, the vein structure below the Pennsylvania 700-foot level, where a number of east dipping fissures have been developed, and where the stopes show that the strike of the vein has changed more to the west. The continuity of the Pennsylvania vein down to the lowest workings of the mine is, however, supported by features that, in my judgment, have not been overcome. South of the Pennsylvania Middle shaft the Pennsylvania Company has sunk a winze from the Pennsylvania 700-foot level, following the vein down to the 900 W. Y. O. D. level; and north of the shaft another winze has been sunk from the same Pennsylvania level, which, together with the W. Y. O. D. upraise, follows the vein also down to the 900-foot W. Y. O. D. level. Here, at two points in the mine, about 400 feet apart, the Pennsylvania vein continues down without a break or complication to the lowest workings of the mine. This is a fact that cannot be ignored, and has not, in my judgment, been overcome by evidence of complications elsewhere. One of these complications is found in what is

known as the "Horseshoe" winze north of the Pennsylvania shaft. The winze starts from the bottom of the stope of the 700-foot level, and descends to the 800-foot level, a distance of about 120 feet. The claim of the Pennsylvania Company that this vein is continuous at this point has been vigorously contested by the Grass Valley Company, and much interesting testimony has been introduced concerning this section. The Pennsylvania Company claims that the entire section is mineralized, and, in addition, that the vein descends through connecting east dipping fissures in the same manner as at other points in the mine, to which reference has heretofore been made. The following diagram illustrates the character of the Horseshoe winze, as shown by the evidence:

Considering the testimony relating to this winze in connection with the testimony showing the continuity of the vein at the other points mentioned on the same horizontal plane, the complications found here are certainly not beyond explanation, and under the circumstances the explanation given appears to be satisfactory. The theory of Mr. Janin that the massive country rock of this district has the rhombohedral structure, and that the joint planes along which the fissures were formed were the faces of the rhombohedral sections of rock, does not, in my opinion, conflict with the claim that the main west dipping vein maintains its continuity through the complications found in the Pennsylvania mine. On the contrary, it may explain such complications, and account for the segments of transverse fissures found connecting the upper and lower parts of the west dipping vein. The contractions and tiltings of the earth's surface would necessarily open zigzag fissures along the planes of rhombohedral sections, and circulating currents, either ascending or descending, following the lines of least resistance, would form a vein in a zigzag channel through the fissured rock, in the changing courses of which would naturally be found the deposits developed in this mine. In other words, the transverse fissures claimed by Mr. Janin for his rhombohedral sections may explain the form and extent of the east dippers found in the Pennsylvania mine.

The strike of the vein at and below the 700-foot level has also been urged by the Grass Valley Company as a fact of great significance. It is contended that the strike of the vein at this point is such that it cannot be the same vein as the one found at or near the surface. This fact would be of some importance if the vein was an ideal one, maintaining a uniform strike and dip throughout its entire course. But it is not an ideal vein, and there are very few such to be found. Mr. Keyes has found but one in his long and varied experience, and the extent of litigation based upon extraordinary departures from the ideal vein indicates that they are rarely found. In the North Star Case [1] in this court the vein in controversy was in the Grass Valley district. It was there found that the strike of the vein below was at many places almost at right angles to the strike of the vein at the surface. This twisting or turning of the vein is accounted for there, as here, by the folding of the rock under pressure and contraction, such as we find demonstrated by geological investigation throughout this region. This objection to the Pennsylvania vein is, in my judgment, without any force, and requires no further discussion.

The relation of the Crescent claim to this controversy may be disposed of in a few words. It is an old claim, running north and south, with a vein apparently dipping to the east; but no development has been made on the surface or elsewhere showing any connection whatever between the vein found on the surface and the vein in dispute. In the absence of such a showing, the evidence in favor of the continuity of the Pennsylvania vein must prevail.

It follows from these considerations that I am of the opinion that

[1] 73 Fed. 597.

the Pennsylvania Company has established its right to all the ore bodies and sections of the mine in dispute. The evidence as to how far south this right extends on the so-called underlap is not very clear, but a trough line or depression has been found in the vein extending from the 900-foot W. Y. O. D. level in a direction a little north of east up to near the 800-foot W. Y. O. D. level. This trough line starts from the 900-foot W. Y. O. D. level at a point about 150 feet south of the Pennsylvania shaft projected to that level. In the absence of evidence showing a clearer division between the Pennsylvania and W. Y. O. D. veins, this line will be adopted by the court as the dividing line between the two veins in this particular section.

The first case will be referred to a referee or commissioner to be appointed by the court, to take testimony and report as to the damage sustained by the Pennsylvania Company by reason of the wrongful acts of the Grass Valley Company, and such further proceedings will thereupon be had as are provided for in the stipulation of the parties dated April 17, 1901. In the second case a finding will be prepared and a judgment entered in favor of the defendant.