[Sac. No. 5246. In Bank.—January 31, 1941.]

WORTHINGTON AMES et al., Appellants, v. EMPIRE STAR MINES COMPANY, LTD., et al., Respondents.

Simeon E. Sheffey and Richard Belcher for Appellants.

Robert M. Searls, Jones & Finnegan and William E. Colby, for Respondents.

TRAYNOR, J.—This controversy is between the owners of mining property, known as the Pennsylvania and Jefferson mines, upon whose land there is the outcropping of a gold-bearing quartz vein, and the owners of non-mineral surface land, known as the Ames Tract, beneath the surface of which this vein dips. The latter, as plaintiffs, brought suit for an injunction to prevent defendants, the owners of the Pennsylvania and Jefferson mines, from following and mining this vein some 500 to 1,000 feet beneath the surface of the plaintiffs' land, and for an accounting of minerals previously extracted. Plaintiffs appeal from a judgment of the superior court in favor of defendants.

The controversy turns upon the priority of title to the subsurface of the plaintiffs' land. Defendant mine owners claim the right to mine extralaterally beneath the plaintiffs' land by virtue of the Mining Act of Congress of July 26, 1866 (14 Stats. at Large 251), which recognized and legalized the right of miners, in accordance with existing miners' rules and regulations, to follow a vein which had its apex upon the surface of their land as it dipped down extralaterally beneath the surface of adjoining government land. Plaintiffs trace their title back to the Railroad Grant Act of July 25, 1866 (14 Stats. at Large 239), by which Congress provided for land grants to the California and Oregon Railroad, later the Central Pacific Railroad, but expressly excepted mineral lands from the terms of the act. Plaintiffs contend that since this act was passed one day earlier than the Mining Act, the railroad received a fee-simple title to the entire tract, surface and subsurface, so that the Mining Act passed the next day could in no way operate to confer upon the owners of adjoining mines the right to mine extralaterally beneath the land granted to the railroad.

On June 14, 1880, the Central Pacific Railroad, pursuant to its legislative grant, secured a patent to the Ames Tract which transformed it from a "float" to an established title

by the definite location of the railroad line. The patent stated that the Ames Tract was agricultural land, and plaintiffs contend that this patent conclusively determined the character of the land as non-mineral, and related the title back to the date of the Railroad Grant Act of July 25, 1866. A patent to the Pennsylvania claim was secured by the defendants' predecessors in interest on August 18, 1880, pursuant to the Mining Act of July 26, 1866. In 1872, Congress passed another act relating to mines which provided that a mining claim, to secure extralateral rights, could equal but not exceed 1500 feet along the vein or lode. Plaintiffs assert that since the defendants' patent was secured subsequent to the passage of this act, it is subject to the provisions thereof, and therefore that the owners of the Pennsylvania claim, which is 1540 feet along the vein or lode, are precluded from claiming any extralateral rights. No patent was ever secured to the Jefferson claim, which was apparently located at the same time as the Pennsylvania claim, abandoned, and subsequently relocated. The defendants show that they now in effect have full title to it. They also present in evidence the deed of the Ames Tract to the plaintiffs from one Ebert, the immediate predecessor in title, which contains a reservation by him, as grantor, of the right to follow the Jefferson vein beneath the surface of the Ames Tract and to mine therefrom. This right was subsequently conveyed by Ebert to the defendants.

Between the Ames Tract and the Pennsylvania and Jefferson mines there is a narrow strip of school land granted to the State of California under the Act of Congress of March 3, 1853 (10 Stats. at Large 244), and this grant also excepted mineral lands from its terms. Subsequent to its final survey in 1867, part of this land was conveyed to the defendants, the residue remaining in the hands of the state as school land. Plaintiffs contend that the state acquired a fee simple in this land, including the subsurface, so that defendants could have no extralateral rights therein and were thus effectively cut off from the Ames Tract.

Defendants have presented evidence in the form of testimony of old settlers, abstracts of title, patent records, deeds, and government reports and surveys to prove the original location of both the Pennsylvania and Jefferson claims in accordance with the miners' rules and regulations prior to 1863; the working of these claims, including the subsurface

of the Ames Tract, prior to 1866; the securing of a patent to the Pennsylvania mine in 1880, with a continuous chain of title to this mine culminating in the present defendants; and the securing of full rights by defendants as against all existing claims on the Jefferson mine.

Plaintiffs contend, however, that defendants have not properly established the original location of the Pennsylvania and Jefferson claims, nor compliance by their predecessors in title with the miners' rules and regulations necessary to secure extralateral rights, nor what the rules and regulations were, maintaining that most of the evidence introduced by the defendants in these regards is inadmissible as hearsay.

■ It is clear that Congress intended by the Mining Act of July 26, 1866, to recognize and give legal validity to all existing mining claims in accordance with local rules, customs, and regulations, including extralateral rights in those lands to which such rules and regulations applied. (Lindley, Mines [3d ed.], secs. 40–46; *Jennison* v. *Kirk,* 98 U. S. 453 [25 L. Ed. 240]; *St. Louis Smelting & Ref. Co.* v. *Kemp,* 104 U. S. 636 [26 L. Ed. 875]; *Morton* v. *Solambo C. M. Co.,* 26 Cal. 527.) According to defendants' evidence the Pennsylvania and Jefferson mines clearly fall within the compass of the act, for prior to its passage their owners located and mined the vein running extralaterally under the Ames land.

■ Under the act they acquired legal title to such extralateral rights provided such rights had not been previously conveyed away by the government, for the Mining Act could not, of course, operate to divest private owners of existing vested rights. (Lindley, Mines [3d ed.], sec. 611; *Amador Medean Gold M. Co.* v. *South Spring Hill Gold M. Co.,* 36 Fed. 668 [13 Sawy. 523]; *Davis* v. *Wiebbold,* 139 U. S. 507 [11 Sup. Ct. 628, 35 L. Ed. 238].)

The plaintiffs contend that the government had previously conveyed away such rights. They cite the Railroad Grant Act of July 25, 1866, enacted one day earlier than the Mining Act, which conferred upon the California and Oregon Railroad, later the Central Pacific Railroad, title to land over which the railroad agreed to construct a line in the future. They argue that since in pursuance to this act the Central Pacific Railroad did locate on certain land, including the Ames Tract, and secure a patent thereto, the full title in fee simple passed to the railroad as of July 25, 1866, and they regard the legal title as having accrued from that date.

(*Wisconsin Central R. R. Co.* v. *Price County,* 133 U. S. 496 [10 Sup. Ct. 341, 33 L. Ed. 687] ; *Deseret Salt Co.* v. *Tarpey,* 142 U. S. 241 [12 Sup. Ct. 158, 35 L. Ed. 999] ; *Jatunn* v. *Smith,* 95 Cal. 154 [30 Pac. 200].) It is their contention that the full title to the Ames Tract was conveyed away prior to the passage of the Mining Act of July 26, 1866, so that the latter could in no way confer upon the adjoining mines extralateral rights in the Ames Tract.

■ This argument might seem persuasive except for one vital factor. The Railroad Grant Act of July 25, 1866, upon which the plaintiffs rely for their original title, specifically excepted from its operation all mineral lands. The terms of the act make it clear that Congress did not intend to vest in the railroad title to any mineral lands of the United States. (*Barden* v. *Northern Pacific R. R. Co.,* 154 U. S. 288 [14 Sup. Ct. 1030, 38 L. Ed. 992] ; *United States* v. *Sweet,* 245 U. S. 563 [38 Sup. Ct. 193, 62 L. Ed. 473] ; *Broder* v. *Natoma Water & M. Co.,* 101 U. S. 274 [25 L. Ed. 790] ; *Northern Pacific R. R. Co.* v. *Sanders,* 166 U. S. 620 [17 Sup. Ct. 671, 41 L. Ed. 1139] ; *McClintock* v. *Bryden et al.,* 5 Cal. 97 [63 Am. Dec. 87].) The subsurface of the Ames Tract being clearly mineral could not pass under the terms of the act but remained in the government, and the Pennsylvania and Jefferson mines received full extralateral rights to mine therein by virtue of the Mining Act of July 26, 1866. (*Ibid.*)

Plaintiffs cite *Davis* v. *Weibbold, supra,* and *Amador Medean Gold Mining Co.* v. *South Spring Hill Gold Mining Co., supra,* to uphold their proposition that the Railroad Grant Act of July 25, 1866, passed full title to the railroad at that time as against any subsequently accruing mining claims. These cases, however, hold only that at the time of final and definite location of agricultural or townsite land full title therein passes to the grantee as against any mineral rights not then known to exist but coming into being at a later time. In the present case there was no final and definite location of the Ames Tract by the railroad until the securing of the patent in 1880. Under the act of July 25, 1866, it had merely a "floating grant" whereby it might secure title to land on which it subsequently located. When the Ames Tract was finally and definitely located in 1880 its subsurface not only was known to be mineral but was subject to the vested extralateral rights of the adjoining

mines. The holdings of the Amador-Medean and Davis cases thus clearly have no application here.

■ The patent which definitely located and established the railroad's claim stated that the Ames Tract was agricultural land. Plaintiffs reason that this statement is conclusive as to the nature of the land since the time for coming in and attacking the patent has long since expired, and conclude that since the title to the land secured by the patent relates back to the date of the Railroad Grant Act, the full legal title to the Ames Tract had vested in the railroad before the conferring of extralateral rights upon the mines. The act alone, however, cannot be the source of title to any mineral lands. As Justice Field stated in *Barden* v. *Northern Pacific R. R. Co.*, *supra*, the Railroad Grant Act of July 25, 1866, when it excepted mineral lands meant that title to all mineral lands was to remain in the United States, and no rights to such lands could in any way pass to the railroad. The patent issued to the railroad by virtue of the act could legally affect only non-mineral land, and the theory which relates the title back to the date of the act cannot extend to "all mineral lands" excepted from the act in express terms. It follows that title to such mineral lands could be acquired as against the railroad subsequent to the enactment of the Railroad Grant Act, and at any time up to the date of the patent. (*Barden* v. *Northern Pacific R. R. Co.*, *supra*; *Northern Pacific R. R. Co.* v. *Sanders*, *supra*.)

■ Hence, the contentions advanced by plaintiffs can be resolved into the theory that the patent to the railroad is conclusive as to the agricultural character of the land. In support thereof they cite *Burke* v. *Southern Pacific R. R. Co.*, 234 U. S. 669 [34 Sup. Ct. 907, 58 L. Ed. 1527]; *West* v. *Standard Oil Co.*, 278 U. S. 200 [49 Sup. Ct. 138, 73 L. Ed. 265]; *Davis* v. *Wiebbold*, *supra*. These cases, however, concern the rights of a mining claim coming into existence after the securing of the agricultural patent. They stand for the proposition that the patent is conclusive as to the character of the land as against mining claims subsequently located. Such a patent, however, issued merely on the basis of an *ex parte* hearing on behalf of the claimant to the land can in no way abrogate the existing vested extralateral rights of parties who had nothing to do with the proceedings. (*Lawson* v. *U. S. Mining Co.*, 207 U. S. 1, 16 [28 Sup. Ct. 15, 52 L. Ed. 65]; *U. S. Mining Co.* v. *Lawson*, 134 Fed. 769, 775,

776; *Clark-Montana R. Co.* v. *Butte etc. Co.,* 233 Fed. 547, 556; *Butte etc. Co.* v. *Clark-Montana R. Co.,* 248 Fed. 609, 615 [160 C. C. A. 509]; Lindley, Mines [3d ed.], sec. 730, p. 1785.) ▆▆ It is well established that the government cannot convey away land which it no longer owns and that a patent cannot cut off previously existing vested rights in the patented property. (*Reynolds* v. *Iron Silver Mining Co.,* 116 U. S. 687 [6 Sup. Ct. 601, 29 L. Ed. 774]; *Noyes* v. *Mantle,* 127 U. S. 348, 353, 354 [8 Sup. Ct. 1132, 32 L. Ed. 168]; *Wright* v. *Roseberry,* 121 U. S. 488, 518–520 [7 Sup. Ct. 985, 30 L. Ed. 1039]; *Leavenworth Lawrence & Galveston R. R. Co.* v. *United States,* 92 U. S. 733 [23 L. Ed. 634]; *St. Louis Smelting & Ref. Co.* v. *Kemp,* 104 U. S. 636, 641 [26 L. Ed. 875]; *Davis* v. *Wiebbold,* 139 U. S. 507, 518, 519 [11 Sup. Ct. 628, 35 L. Ed. 238].) This principle is further supported by the California cases (*Van Ness* v. *Rooney,* 160 Cal. 131 [116 Pac. 392]; *Chicago Quartz M. Co.* v. *Oliver,* 75 Cal. 194 [16 Pac. 780, 7 Am. St. Rep. 143]; *Brown* v. *Luddy,* 121 Cal. App. 494 [9 Pac. (2d) 326]) and by cases in other jurisdictions (*Butte City Smokehouse Lode Cases,* 6 Mont. 397, 401 [12 Pac. 858]; *Silver Bow M. & M. Co.* v. *Clark,* 5 Mont. 378, 415 [5 Pac. 570]; *Talbott* v. *King,* 6 Mont. 76 [9 Pac. 434]; *Kansas City etc. Co.* v. *Clay,* 3 Ariz. 326 [29 Pac. 9]; *Loney* v. *Scott,* 57 Or. 378 [112 Pac. 172, 173, 32 L. R. A. (N. S.) 466]).

The patent secured by the railroad in 1880 was issued under the authority of the Railroad Grant Act of July 25, 1866, and could in no way apply to mineral land title to which had been previously vested in others. Any authority it might acquire in the passage of time as to the nature of the land, despite the limitations of the act, could operate only against subsequently located claims. (*Van Ness* v. *Rooney, supra; Brown* v. *Luddy, supra.*) Thus, the patent which determined that the Ames Tract was agricultural applied only to the surface of the land and to that portion of the subsurface not already subject to existing extralateral rights. (Lindley, Mines [3d ed.], sec. 613, p. 1462.) Whatever claims plaintiffs advance to the subsurface mineral land of the Ames Tract would have to date from the issuance of the patent and not from the date of the Railroad Grant Act, and by the time of the issuance of the patent the extralateral rights of the Pennsylvania and Jefferson mines in the Ames Tract had already fully vested by virtue of the Mining Act

of July 26, 1866. ■ There can be no objection to having the title to the surface in one person and the title to the sub-surface in another, a practice recognized at common law and widely followed today. (Lindley, Mines [3d ed.], sec. 812.)

■ For the same reasons the state did not, as plaintiffs contend, acquire a fee simple to both the surface and subsurface of the strip of school land intervening between the Ames Tract and the mining properties cutting off any extralateral rights the latter might claim in the former. When the act of March 3, 1853 (10 Stats. at Large 244), made a grant of certain sections of each township to the state for school purposes, it expressly excepted all mineral lands. The land in question was still unsurveyed and the sections of land to be granted therefore still undetermined. Following the survey in 1867, no title could pass from the United States to the state to land determined to be mineral. (*West* v. *Standard Oil Co.*, 278 U. S. 200 [49 Sup. Ct. 138, 73 L. Ed. 265]; *United States* v. *Sweet, supra; Barden* v. *Northern Pacific R. R. Co., supra; Northern Pacific R. R. Co.* v. *Sanders, supra; Ivanhoe M. Co.* v. *Keystone Consol. M. Co.*, 102 U. S. 167, 175 [26 L. Ed. 126].) The mineral subsurface then subject to the vested extralateral rights of the adjoining mines, could therefore not pass to the state under the terms of the grant.

Even if, as plaintiffs contend, the certification by the Register of the United States Land Office on March 7, 1871, that there was no claim or filing on this land other than that of the state had the effect of a patent establishing the complete title of the state, its determination could be effective only against subsequently located mining claims and not against existing vested extralateral rights therein. *Saunders* v. *La Purisima etc. Co.*, 125 Cal. 159 [57 Pac. 656], cited by plaintiffs concerned not only a subsequent claim but one with respect to the surface of the land. In contrast *West* v. *Standard Oil Co.*, 278 U. S. 200 [49 Sup. Ct. 138, 73 L. Ed. 265], indicates that these certificates issued by the registrars of local land offices were unauthorized and of no binding effect.

■ Plaintiffs argue further that the Mining Act of 1872, by restricting future mining claims asserting extralateral rights to a maximum of 1500 feet along the vein, precludes the patent to the Pennsylvania mine, secured at a later date, from

encompassing extralateral rights based upon a greater length. The mining patent cannot thus be limited by that act, however, when issued in pursuance to the earlier act of July 26, 1866, on the basis of an earlier location. (*Lawson* v. *United States Min. Co.*, 207 U. S. 1 [28 Sup. Ct. 15, 52 L. Ed. 65]; *Carson City etc. Min. Co.* v. *North Star Min. Co.*, 73 Fed. 597; affd. 83 Fed. 658 [28 C. C. A. 333]; *Pennsylvania Consol. Min. Co.* v. *Grass Valley etc. Co.*, 117 Fed. 509.) The plaintiffs themselves declare that a patent properly issued and in conformance with the provisions of an Act of Congress relates the title back to the date of that act.

Furthermore, the additional length of the claim resulted from the consolidation of three original claims, the lines of which need not be shown to establish the validity of an existing patent to the consolidated claim on collateral attack. (*St. Louis Smelting & Ref. Co.* v. *Kemp*, 104 U. S. 636 [26 L. Ed. 875]; *Tucker* v. *Masser*, 113 U. S. 203 [5 Sup. Ct. 420, 28 L. Ed. 979]; *Peabody Gold Min. Co.* v. *Gold Hill Min. Co.*, 111 Fed. 817 [49 C. C. A. 637].)

Defendants can establish their extralateral rights in the Ames Tract as owners of the Jefferson mine as well as of the Pennsylvania mine. While the Jefferson mine was never patented and was subsequently abandoned and relocated so that it might be said to constitute a mining claim coming into existence after the issuance of the patent to the Central Pacific Railroad for the Ames Tract (*Burke* v. *Southern Pacific R. R. Co., supra*), the deed of the Ames land to the present plaintiffs from Ebert, their immediate predecessor in title, specifically reserved to Ebert, his successors and assigns, the right to follow the Jefferson vein beneath the Ames land and to mine therefrom. By mesne conveyances, defendants succeeded to the rights of Ebert under this reservation, by virtue of which they clearly have the right to follow the vein of the Jefferson mine beneath the surface of the plaintiffs' land.

As for plaintiffs' contention that regular performance of annual labor is necessary to maintain a good title, it is well established that title to a mining claim does not terminate upon a failure to perform annual labor. The intervention of a third party and a relocation of the ground must occur before any forfeiture can take place. (Lindley, Mines [3d ed.], sec. 651; *Wilbur* v. *Krushnic*, 280 U. S. 306 [50 Sup. Ct. 103, 74 L. Ed. 445]; *Belcher etc. Co.* v. *Deferrari*,

62 Cal. 160, 163; *Emerson* v. *McWhirter,* 133 Cal. 510 [65 Pac. 1036].) Hence there are no grounds for attacking the validity of the Pennsylvania claim on this basis. ▮▮▮ The plaintiffs are precluded from taking advantage of any forfeiture and subsequent relocation of the Jefferson claim because of the reservation of mining rights in their deed to the Ames Tract from Ebert.

It remains to consider plaintiffs' contention that the defendants have failed to prove the original location of the mining claims, their continued existence, compliance with the miners' rules and regulations, or what these rules and regulations were. The trial court found that the defendants' evidence established all these things; the question here turns on whether such evidence is hearsay as plaintiffs contend. Defendants introduced properly authenticated copies of deeds and other instruments now of record in the County Recorder's Office in Yuba County, patent records on file in the official records in the General Land Office in Washington, D. C., printed official reports of the ''Mineral Resources'' of the Public Domain of the West, published under authority of Congress, and other historical material. This evidence was supplemented by the oral testimony of two old settlers that both the Pennsylvania and the Jefferson mines were in operation on the present location in the early 1860's. The case of *Kent* v. *Snyder et al.* (1866), 30 Cal. 666, which mentions in its statement of facts the location of the Jefferson claim by its original owners corroborates the existence of this claim prior to 1866.

▮▮▮ It is a well established exception to the hearsay rule that evidence of common reputation existing previous to the controversy may be introduced to prove the existence of boundaries and facts of a public or general interest more than thirty years old. (Code Civ. Proc., sec. 1870.) The original location of a mine, particularly on government land, is within the scope of this exception (*Muller* v. *Southern Pacific Branch Ry. Co.,* 83 Cal. 240 [23 Pac. 265]; *Simons* v. *Inyo Cerro Gordo etc. Co.,* 48 Cal. App. 524 [192 Pac. 144]). Recitals in ancient deeds (*Wilson* v. *Snow,* 228 U. S. 217 [33 Sup. Ct. 487, 57 L. Ed. 807]; *Garbarino* v. *Noce,* 181 Cal. 125 [183 Pac. 532, 6 A. L. R. 1433]), and statements in official documents kept as part of the regular function of the office by some department of the government or authorized by the legislature are likewise recognized exceptions to the hearsay rule.

(Code Civ. Proc., secs. 1920, 1924; *Chesapeake & Delaware Canal Co.* v. *United States,* 250 U. S. 123 [39 Sup. Ct. 407, 63 L. Ed. 889].)

 The evidence introduced by the defendants is admissible to prove the proper location and existence of the mining claims under these exceptions to the hearsay rule. The patent records containing abstracts of title to the mining claims, recitals as to the location of these claims in several ancient deeds, verified statements as to the location and possession of the mines, a copy of the articles of incorporation of the early Pennsylvania Mining Corporation, a certified copy of the minutes of meetings of the Quartz Miners of Brown's Valley, descriptions of the claims by metes and bounds, the Register's final certificate of entry of the patent, and the field notes of survey and report of the United States Deputy Mineral Surveyor on the Pennsylvania mine are clearly records kept in the usual course of business by the General Land Office and thus admissible as official documents. (*Culver* v. *Uthe,* 133 U. S. 655 [10 Sup. Ct. 415, 33 L. Ed. 776]; *Galt* v. *Galloway,* 29 U. S. 332 [7 L. Ed. 876]; *People* v. *Hagar,* 52 Cal. 171.) So, too, the official report of the Mineral Resources of the Public Domain of the West being published under the direct authority of Congress as an official report to the Secretary of the Treasury falls into the category of an official document, the contents of which are admissible to show the location and working of the mines in pursuance to the miners' rules and regulations then in existence. In addition, since these locations may be proven by evidence of general reputation previous to the controversy there is no reason why the defendants cannot introduce the History of Yuba County by Chamberlain and Wells (1879) for such a purpose. (Code Civ. Proc., sec. 1936.) Thus, the finding by the trial court that a valid location was made is a legitimate finding of fact supported by admissible evidence. (*Altoona Q: M. Co.* v. *Integral Q. M. Co.,* 114 Cal. 100 [45 Pac. 1047]; *Gruwell* v. *Rocca,* 141 Cal. 417 [74 Pac. 1028]; *Harris* v. *Kellogg,* 117 Cal. 484 [49 Pac. 708]; *Colman* v. *Clements,* 23 Cal. 245; *Adams* v. *Crawford,* 116 Cal. 495 [48 Pac. 488].)

The judgment is affirmed.

Shenk, J., Edmonds, J., Ward, J.. *pro tem.,* Peters, J., *pro tem.,* and Gibson, C. J., concurred.

CARTER, J., Dissenting.—I dissent.

The majority opinion in this case is so lacking in logical reasoning and unsupported by authority that it can truthfully be said that it is basically unsound.

While my past experience as a practical miner and natural leaning toward the mining industry should cause me to favor the conclusion reached in the majority opinion, I am persuaded by considerations of both reason and authority that such conclusion is contrary to settled principles of law, sound reasoning, and every consideration of equity and natural justice.

The conclusion reached in the majority opinion not only renders insecure and subject to collateral attack every railroad patent in this state, but it places the same cloud upon every agricultural patent which has been issued within the last seventy-five years.

The gist of the majority opinion in this case is that the railroad company by its patent obtained title to the surface of the Ames Tract only, and that the predecessors in interest of the mining company obtained title to the subsurface of said tract. In my opinion this view is palpably erroneous for the reason that it is the settled rule, and the authorities are uniform in holding, that a patent to a railroad company issued pursuant to the so-called Railroad Grant Acts conveys thereby a common law fee in nonmineral land. (*Lawson* v. *U. S. Mining Company,* 207 U. S. 1 [28 Sup. Ct. 15, 52 L. Ed. 65]; *Amador Medean Gold Mining Co.* v. *South Spring Hill Gold Mining Co.,* 36 Fed. 668 [13 Sawy. 523].)

Section 829 of our Civil Code provides: "The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it."

No attempt is made in the majority opinion to define the limits of the so-called surface and subsurface ownerships. Nothing is said therein to indicate whether or not it is meant that the owner of the surface may penetrate into the subsurface to any extent, or if so, to what extent; in other words, under this announced new doctrine, may the owner of the surface dig a post hole, a cellar, or sink a well? If he may do these things, how much further may he go?

The effect of the holding of the majority opinion is to grant to the owner of the Pennsylvania and Jefferson claims all of the mineral deposits which may be under the surface of the

Ames Tract whether or not the same constitute the extra-lateral dip of veins apexing on said claims; in other words, by holding that the railroad company got no title to the mineral deposited in the Ames Tract because by its patent it simply got title to the surface of said tract, and that the predecessor in interest of the defendant got title to the sub-surface of said tract, the plaintiffs in this action are deprived of the right to extract mineral deposits from said tract even though they have no connection or relation to the veins apexing on the Pennsylvania and Jefferson claims.

The majority opinion grants to the defendant much broader rights than those claimed by the defendant itself, as the right claimed by the defendant in this case is based exclusively upon the extralateral right doctrine and not otherwise.

The rights flowing from the extralateral right doctrine have many restrictions and limitations and certainly do not include the entire subsurface of the land into which veins may dip. First, some of those limitations are expressed in the law establishing and confirming such rights. In 30 U. S. C. A. 26, it is provided in part: "The locators . . . shall have the exclusive right of possession . . . of all the surface included *within the lines of their location,* and of all veins, lodes, and ledges throughout their entire depth, the *top or apex of which* lies *inside* of such surface lines extended downward vertically, although such veins, lodes or ledges may so depart from a perpendicular in their *course downward* as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges *shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations,* so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. Nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another."

Second, it is elementary that to have extralateral rights in a vein, the apex thereof must be on the location. (Costigan Mining Law, p. 409 et seq.; 30 U. S. C. A. 26.)

Third, the identity and continuity of the vein must be established and it must have an apex and a dip. As stated in Costigan on Mining Law, page 410:

"The identity and substantial continuity of the vein from its apex down is essential to the existence of extralateral rights on the vein, and there are no extralateral rights unless the vein has an apex and a dip." And in this connection the presumption is that no dip exists. (Costigan on Mining Law, p. 411; Lindley on Mines [3d ed.], sec. 615.)

Fourth, extralateral rights do not extend to secondary veins which cross the principal vein at right angles. (Costigan on Mining Law, p. 440.)

To say that the subsurface rights were acquired by the mining patentees is manifestly unsound. The most that they can claim are the extralateral rights and certainly such rights do not embrace all of the subsurface rights nor all of the right to all of the mineral under the surface of the Ames Tract. This is forcefully illustrated by the rule that extra-lateral rights only extend along the *dip* of the vein, that is, continue only as long as the vein runs *downward* in its lateral extension. If it at any time runs parallel or upward then the extralateral rights cease. It is said in 40 C. J. 819: "An extralateral right applies to the vein *only on its downward course* or dip, outside the side lines, and does not authorize a locator to follow the vein on its course or strike outside the boundaries of the claim, as where it becomes flattened and extends from thence horizontally in a departure from the general plane of the vein, or for any considerable distance takes an upward trend."

In *Tom Reed Gold Mines Co.* v. *United Eastern Mining Co.,* 24 Ariz. 269 [209 Pac. 283, 287], it is said:

"The authorities construing this section hold (1) that the vein to which this extralateral right is claimed must be followed on its 'course downward' and (2) that the right attaches only to the identical vein which has its apex within the location, and not to another and different vein lying outside the vertical boundaries of the claim. Both these conditions must exist, and are independently essential to the right of extra-lateral possession and enjoyment. We treat of them in order:

"(1) The vein must be pursued on its course downward.

"In *Stewart M. Co.* v. *Ontario M. Co.,* 23 Idaho, 724, 132 Pac. 787, it was said:

" 'Sometimes it may happen that the 'downward course' of a vein will be perpendicular, and the vein will form a vertical plane, but, as a rule, there is a deflection in the

downward course of these mineral veins from the perpendicular, and we call this their dip; but still the course of the dip is always 'downward,' and, when the plane of the vein reaches the horizontal, then we have a blanket vein or lode, *and on such a vein a locator has no extralateral right.* . . . The Supreme Court always qualifies its holdings in this respect by the condition of the statute that the course between those vertical planes must be downward.'

"In *Southern Nevada G. & S. M. Co.* v. *Holmes M. Co.,* 27 Nev. 103, 73 Pac. 759, 103 Am. St. Rep. 759, it was held:

" 'If the defendant entered upon a ledge having its apex within the exterior boundaries of plaintiff's location, and extracted ore therefrom between the planes drawn vertically downward through the end lines of said location, the right of the plaintiff to recover damages for such acts would not be affected by proof merely that the place from which such ore was extracted could be reached by going continuously through ledge matter from a ledge having its apex within the exterior boundaries of a prior location belonging to the defendant, but it must further appear that such passage from the apex of defendant's ledge is made continuously downward on the dip of that ledge, and if any portion of such passage must necessarily be made either upward, or laterally along the strike, then the plaintiff's right to recover is not affected.'

"See Lindley on Mines (3d ed.) sections 319 and 589, and *St. Louis M. Co.* v. *Montana M. Co.,* 113 Fed. 900, 51 C. C. A. 530, 64 L. R. A. 207; Id., 194 U. S. 235, 24 Sup. Ct. 654, 48 L. Ed. 953.

"While the authorities which have passed upon the question are but few in number, there would seem to be no reason to doubt that the excerpts we have quoted state the true rule, which is that no extralateral right exists to a vein, lode, or ledge beyond the point where in its course outside the claim of apex it becomes flattened and extends from thence horizontally in a departure from the approximate general plane of the vein in its downward course, or for any considerable distance takes an upward trend."

Sixth, the holder of such rights has no general exploratory rights under another's land, and he cannot tunnel through the other's land to reach his vein, or as it is said in *St. Louis Min. & Mill. Co.* v. *Montana Min. Co.,* 113 Fed. 900 [51

C. C. A. 530, 64 L. R. A. 207] (affirmed: 194 U. S. 235 [24 Sup. Ct. 654, 48 L. Ed. 953]), at page 902:

"They are given the right of possession of the surface and of everything within their own claim except the veins or lodes therein, which may have their apices in the surface of another claim, so as to give the owner of the latter extralateral rights, and they are given the right to follow outside of their side lines and into adjoining claims all veins or lodes which have their apices in their own claims, so as to confer extralateral rights. *This is their right, and no more. There is no warrant for saying that they have any general right of exploration within land of an adjoining patented claim, whether upon or below the surface.* The right of exploration is given for the purpose of making discovery of mineral. Of what avail would be the right of exploration if no benefit could be obtained from discovery made thereby? The ground covered by a subsisting, valid mineral location is open to exploration only by the owner thereof. The statute gives the appellants the right to follow the vein which they were *seeking to reach by the tunnel, but it confers upon them no right to approach it from any point other than from the vein or lode itself.*"

It is a matter of common knowledge among persons familiar with mineral deposits, and I know from my own experience, that two or more distinct mineral deposits may exist in such close proximity that they may be covered by a single mineral location; hence, it is possible that there are mineral veins underlying the surface of the Ames Tract which may or may not be subject to the extralateral right of mining claims located on adjacent land. By holding that the railroad company got title to the surface of the Ames Tract only, the plaintiffs would be barred from extracting the mineral from said deposits under the rule announced in the majority opinion.

This doctrine of surface and subsurface ownerships finds no support in the decided cases in this or any other country where the common law prevails. The only authority for it cited in the majority opinion is Lindley on Mines, Third Edition, section 812. While the language used by this author in connection with this particular subject matter is very vague, he frankly states that it is a *"radical doctrine"*.

I feel then that I am justified in saying that the majority opinion stands alone in the enunciation of this unsound and unsupported doctrine. In this respect it may be said that

said opinion is a hybrid, and like the quadruped noted for its stubbornness, it is "without pride of ancestry or hope of posterity".

The specific question which we are called upon to determine in this case is whether the defendant has the right to follow a vein of gold bearing quartz apexing on its mining claim which dips extralaterally from defendant's mining claim into plaintiffs' land, the eastern boundary of which is parallel with, but 200 feet west of the western boundary of said mining claim, where plaintiffs' title originated by virtue of the Railroad Grant Act of July 25, 1866, was confirmed by a patent issued to the Central Pacific Railway Company on June 14, 1880, and by mesne conveyances vested in plaintiffs.

No claim is made by defendant that either the railroad company or any of the government officials had any knowledge whatever that the Ames land contained a mineral deposit or that it was other than nonmineral land at the time the patent was issued. Said land was duly classified as nonmineral by the United States Land Office, and a patent therefor was duly and regularly issued pursuant to said Railroad Grant Act. The railroad company thereafter conveyed a fee title to said land to the predecessor in interest of plaintiffs, and this title was ultimately conveyed to plaintiffs.

The United States Supreme Court has uniformly held that there must be a time at which title to land must be settled, and has determined that said time shall be at the date of issuance of patent.

Since mineral lands are excluded from the grants in aid of railroads, before patent can issue to railroad lands, there must be a determination as to whether or not the land is mineral or nonmineral in character, that is, whether it is more valuable for mining or agricultural purposes.

The duty of making such a decision devolves upon the General Land Office, whose decision is in the nature of a *quasi*-judicial determination, and conclusive thereafter as against collateral attack.

As the majority opinion does not contain either a complete or correct statement of the facts of this case, I will make a statement of the essential facts before proceeding with a discussion of the legal principles applicable thereto.

This is an appeal from a judgment for defendant in an action in ejectment. Although plaintiffs asked for an injunc-

tion and accounting in the same action, it was agreed by stipulation of the parties that trial of the issue of damages should be held in abeyance until the question of title had been determined on appeal. Therefore, that question only is now before this court.

The action arose out of a dispute over the title to a vein of gold bearing quartz which extends extralaterally under the land of the plaintiffs from an apex on mining claims in the possession of the defendant.

Defendant admittedly has been extracting the ore from said vein, and maintains its right to do so by virtue of its ownership of the apex of said vein within said mining claims.

The land belonging to the plaintiffs hereinafter called "the Ames tract", is described by legal subdivision as the S. W. ¼ of section 15, T. 16 N. R. 5 E., M. D. B. & M., situated in Yuba County, California. The inception of the Ames title is an Act of Congress, effective July 25, 1866 (14 U. S. Stat. A. L. 239), granting to the California and Oregon Railway Company certain lands "to aid in the construction of a railroad". Mineral lands were excepted from this grant. Upon completion of the railroad, a map showing its location was filed in the United States Land Office, July 27, 1870. Thereafter, the Central Pacific Railroad Company succeeded to the rights of the California and Oregon Railway Company and received a United States patent for lands, including the Ames land, on June 14, 1880. Plaintiffs acquired title to the Ames Tract through a deed from J. E. Ebert, who had succeeded to the railroad title.

The defendant's land is located in the S. E. ¼ of section 16, T. 16 N. R. 5 E., M. D. B. & M., which adjoins said section 15 on the west. It consists of two quartz mining claims, known as the Pennsylvania and Jefferson claims, which defendant holds under lease and option from the owners. These claims and the Ames Tract are not adjacent, for a strip of school land two hundred feet in width lies between them. The claims, both four hundred feet in width, are located contiguously on a north and south vein of gold bearing quartz, and have side lines substantially parallel with the section line between said sections 15 and 16. The Jefferson claim extends seven hundred fifty feet north from the south line of section 16. The Pennsylvania claim joins the Jefferson claim at its north boundary and continues northward for a distance

of one thousand five hundred forty feet. The vein which extends throughout the length of these two claims dips extralaterally under the narrow strip of school land and continues into the Ames property.

The Act of Congress under which defendant asserts its title to the Pennsylvania and Jefferson claims authorized the disposal of mineral lands from the public domain and became effective July 26, 1866 (14 U. S. Stat. A. L. 251). Complying with the provisions of this statute, one of defendant's predecessors secured a patent to the Pennsylvania mining claim. The first application for said patent was made in January, 1874, but because of adverse proceedings and a technical defect, this application was denied with leave to renew. The renewal was made January 22, 1880. Thereafter, on May 31, 1880, the local land office receiver at Marysville issued his receipt for money paid by applicant, and the register of said office issued his final certificate of entry. Patent to the Pennsylvania claim was issued by the United States Government on August 18, 1880, to the Pennsylvania Mining Company, which company was incorporated in 1863.

The Jefferson claim is unpatented but held by location. Although the earliest recorded location of this claim apparently was made in 1891, defendant claims its predecessors have worked both the Pennsylvania and Jefferson claims since the early days of California.

The strip of school land which separates the mining claims from the Ames Tract was granted to the State of California under the Act of Congress dated March 3, 1853 (10 U. S. Stat. A. L. 244), which granted the 16th and 36th sections of each township for school purposes. The grant of these sections also was subject to the reservation of mineral lands. The lands were then unsurveyed, the survey of them being completed August 6, 1867. On May 22, 1882, the eastern one-half of the S. E. quarter of section 16, in which were located the two mining claims, was conveyed by patents of the State of California to certain grantees, I. S. Belcher and W. C. Belcher, who later conveyed their titles under the state patents to the Pennsylvania Mining Company, a predecessor of the defendant.

In its statement of facts the majority opinion says: "On June 14, 1880, the Central Pacific Railroad, pursuant to its legislative grant, secured a patent to the Ames tract, which

transformed it from a 'float' to an established title by the definite location of the railroad line.'' Again later the statement is made that ''In the present case there was no final and definite location of the Ames tract by the railroad until the securing of the patent in 1880''; and further that ''The patent which *definitely located* and established the railroad's claim stated that the Ames tract was agricultural land.'' The first of these statements is to say the least ambiguous and the other two indicate a complete lack of understanding as to the time of the vesting of title to railroad land.

The securing of a patent has nothing to do with the actual vesting of title to railroad land. It is merely a confirmation of a title which has already vested. It is too well settled to admit of argument that grants in aid of railroads are grants made *in praesenti*, and that where the line of such roads is not located the grant remains a float, but that when the route of the road is definitely fixed, the sections granted become susceptible of identification, and the title attaches to them and took effect as of the date of the grant cutting off all intervening claims. (*Wisconsin Central Railroad Co.* v. *Price Co.*, 133 U. S. 496, 509 [10 Sup. Ct. 341, 33 L. Ed. 687]; *Deseret Salt Co.* v. *Tarpey*, 142 U. S. 241 [12 Sup. Ct. 158, 35 L. Ed. 999]; *Jatunn* v. *Smith*, 95 Cal. 154 [30 Pac. 200].) Confirmation of this title by patent also relates back to the date of the original grant, thereby cutting off all intervening rights.

The majority opinion states as a contention of the plaintiffs ''that the full title to the Ames tract was conveyed away prior to the passage of the Mining Act of July 26, 1866, so that the latter could in no way confer upon the adjoining mines extralateral rights in the Ames tract.'' Then continues with ''This argument might seem persuasive except for one vital factor. The Railroad Grant Act of July 25, 1866, upon which the plaintiffs rely for their original title, specifically excepted from its operation all mineral lands. The terms of the Act make it clear that Congress did not intend to vest in the railroad title to any mineral lands of the United States (*Barden* v. *No. Pacific R. R. Co.*, 154 U. S. 288 [14 Sup. Ct. 1030, 38 L. Ed. 992]; *United States* v. *Sweet*, 245 U. S. 563 [38 Sup. Ct. 193, 62 L. Ed. 473]; *Broder* v. *Natona Water & M. Co.*, 101 U. S. 274 [25 L. Ed. 790]; *No. Pacific R. R. Co.* v. *Sanders*, 166 U. S. 620 [17 Sup. Ct. 671, 41 L. Ed. 1139]; *McClintock* v. *Bryden et al.*, 5 Cal.

97 [63 Am. Dec. 87])." This much of the opinion's statement is true—that the Railroad Grant Act excepted mineral lands, and that Congress did not *intend* thereby to vest in the railroad title to any mineral lands in the United States. But the next statement in the opinion is completely false and unsupported by the cases cited in its favor,—namely, that *"The subsurface of the Ames Tract being clearly mineral could not pass under the terms of the Act but remained in the Government, and the Pennsylvania and Jefferson mines received full extralateral rights to mine therein by virtue of the Mining Act of July 26, 1866.*

In the Barden case, *supra,* the Northern Pacific R. R. Company claimed title to lands admittedly mineral in character not by virtue of a patent thereto, but on the ground that the lands were not known to be mineral until after the filing of its map showing the location of its road, and that therefore they passed to the railroad company at said time. The court held, and correctly so, that the time for final determination of the character of the land was not the date of the filing of the map of definite location, but the date of the issuance of patent thereto. In the present case, however, the railroad company secured a patent to the land in question. The Barden case, *supra,* stating that the plaintiffs therein had no cause for apprehending that its decision would lead to uncertainty of titles, proceeded to discuss the results which would obtain if a patent were issued:

"We do not think that any apprehension of disturbance in titles from the views we assert need arise. The law places under the supervision of the Interior Department and its subordinate officers, acting under its direction, the control of all matters affecting the disposition of public lands of the United States, and the adjustment of private claims to them under the legislation of Congress. It can hear contestants and decide upon the respective merits of their claims. It can investigate and settle the contentions of all persons with respect to such claims. It can hear evidence upon and determine the character of lands to which different parties assert a right; and when the controversy before it is fully considered and ended, it can issue to the rightful claimant the patent provided by law, specifying that the lands are of the character for which a patent is authorized. It can thus determine whether the lands called for are swamp lands, timber lands, agricultural lands, or mineral lands, and so designate them in

the patent which it issues. The Act of Congress making the grant to the plaintiff provides for the issue of a patent to the grantee for the land claimed, and as the grant excludes mineral lands in the direction for such patent to issue, the Land Office can examine into the character of the lands, and designate it in its conveyance.

"*It is the established doctrine, expressed in numerous decisions of this court, that wherever Congress has provided for the disposition of any portion of the public lands, of a particular character, and authorizes the officers of the Land Department to issue a patent for such land upon ascertainment of certain facts, that department has jurisdiction to inquire into and determine as to the existence of such facts, and in the absence of fraud, imposition, or mistake, its determination is conclusive against collateral attack.*" (Italics added.)

The cases cited in the majority opinion as authority for the statement that "by the terms of the Act it is clear Congress did not intend to vest in the railroad title to any mineral lands of the United States", support this statement with which I am in full accord. However, none of them is authority for the statement which follows to the effect that the *subsurface* of the Ames Tract being clearly mineral could not pass under the terms of the act and remained in the government.

The case of *United States* v. *Sweet, supra,* involved a question as to whether 40 acres of land known to be valuable for coal before Utah became a state, passed to the state by a school land grant which neither expressly included nor excluded mineral lands. The court held that the grant was to be read in the light of the mining laws, the school land indemnity law providing for lieu selections where sections 16 and 36 were mineral, and the settled policy of Congress respecting mineral lands, and concluded that the sections known to be mineral when the grant took effect did not pass under the grant.

In the case of *Broder* v. *Natona Water Co., supra,* defendant's right to maintain a canal over the lands of the plaintiff was upheld although it was constructed over lands subsequently granted to a railroad company, by reason of the fact that Congress had previous to the Railroad Grant Act enacted a statute conferring on owners of such canals a pre-existing right. It does not appear, however, from a reading

of the case that the railroad company's lands were ever patented to it.

The case of *No. Pacific R. R. Co.* v. *Sanders, supra,* does not involve a case in which the railroad company ever obtained a patent to the lands in controversy. The question decided therein was merely that where, at the time of the definite location of plaintiff's road, applications of record were pending to purchase said lands, said applications were ''claims'' within the meaning of the granting act, which excluded therefrom lands ''not free from preemption or other claims or rights at the time the line of said road is definitely fixed.''

*McClintock* v. *Bryden et al., supra,* is an early decision of this court holding that where a person settles on any of the mining lands of this state, he settles on there subject to the rights of miners, who may proceed in good faith to extract valuable minerals therefrom in the most practicable manner in which they can be extracted, with least injury to the occupying claimant, according to the express statutes of this state, even though the agricultural settler settled on the lands prior to said statute.

As can be readily seen none of these cases has any direct bearing on the case at bar. They are authority for the general propositions that mineral lands were excluded from a granting act and do not pass thereby to the grantee, but they in nowise militate against the decision in the Barden case, *supra, that, when a determination has been made by the General Land Office that lands to which application for patent has been made are nonmineral in character, and has issued a patent pursuant to said decision, that said determination is conclusive, and that regardless of the fact that the lands may thereafter appear to contain mineral in paying quantities, a common law fee conveying title to the center of the earth has passed to the patentees.* (Italics added.)

The majority opinion cites and relies upon the cases of *Van Ness* v. *Rooney,* 160 Cal. 131 [116 Pac. 392], *Brown* v. *Luddy,* 121 Cal. App. 494 [9 Pac. (2d) 326], and *Chicago Quartz Mining Co.* v. *Oliver,* 75 Cal. 194 [16 Pac. 780, 7 Am. St. Rep. 143], as authority for its statement that ''It is well established that the government cannot convey away land which it no longer owns and that a patent cannot cut off previously existing vested rights in the patented property.'' In this connection said opinion further states: ''The patent

secured by the railroad in 1880 was issued under the authority of the Railroad Grant Act of July 25, 1866, and could in no way apply to mineral land, title to which had been previously vested in others. Any authority it might acquire in the passage of time as to the nature of the land, despite the limitations of the Act, could operate only against subsequently located claims. (*Van Ness* v. *Rooney, supra; Brown* v. *Luddy, supra.*)''

It is worthy of note that the last cited cases have not been cited or referred to in the voluminous briefs, petitions, or printed or oral argument presented to this court by the eminent counsel on either side of this case. These counsel, or at least some of them, are specialists in the field of mining law, and I feel justified in stating that if the principles of law announced in these cases had any relevancy or application to the legal problems involved in this case, or could possibly form the basis for a legal theory upon which this case could be decided, those cases and the principles of law enunciated therein would certainly have been called to the attention of this court by such counsel.

Aside from my own study and analysis of said cases, which has convinced me that they have no application to the legal problems involved in the case at bar, the failure of eminent counsel for defendant to cite or rely upon them as a basis for the determination of this case, convinces me beyond the possibility of a doubt that said cases cannot be relied upon in support of the conclusion reached in the majority opinion in this case.

I have long been familiar with the case of *Van Ness* v. *Rooney, supra.* It arose in the county where I was born and raised and was the subject of much discussion there for many years; in fact, I called the same to the attention of the author of the majority opinion. The decision of this case, both by the trial court and this court, was predicated upon the proposition that a patent for land included in a railroad grant which expressly excludes and excepts from the lands described in the granting clause "all mineral lands, should any such be found in the tracts aforesaid", does not pass title to a mineral claim included therein which had been duly and legally located prior to the issuance of the patent. Obviously, such is not the problem involved in the case at bar. Furthermore, the case of *Van Ness* v. *Rooney, supra,* was decided by this court prior to the decision by the Supreme

Court of the United States of the case of *Burke* v. *So. Pacific R. R. Co.*, 234 U. S. 669 [34 Sup. Ct. 907, 58 L. Ed. 1527], which held that an exception inserted in patents issued under the Railroad Grant Act to the effect that if any of the lands described should be found to be mineral the same should be excluded from the operation of the patent is unauthorized and void, because the granting act contemplated that the patents should effectually and unconditionally pass the title to the land granted. In my opinion the decision of this court in the case of *Van Ness* v. *Rooney, supra,* is in direct conflict with the decision of the Supreme Court of the United States in the case of *Burke* v. *So. Pacific R. R. Co., supra,* and the Van Ness case, *supra,* can no longer be considered an authority for the legal proposition decided therein.

The case of *Brown* v. *Luddy, supra,* follows the decision of this court in the Van Ness case, *supra,* and the conclusion reached by the District Court of Appeal in the Brown case, *supra,* is predicated almost entirely if not wholly upon the theory advanced by this court in the Van Ness case, *supra.* The factual situation in the case of *Brown* v. *Luddy, supra,* was however, quite different than that in the Van Ness case, *supra,* and there is no similarity between the facts in either of those cases and the case at bar. In the Brown case, *supra,* the plaintiffs' mining claim was located and had been in existence and was being actually operated at the time of the passage of the statute authorizing the issuance of the stock-raising homestead patent which was the basis of defendants' title in said case; said statute and the patent issued to Luddy expressly reserved to the United States "all coal and *other minerals in the land*". This is quite different than the provision in the patent issued to the railroad company in the Van Ness case, *supra,* which excepted "all mineral *lands*". In my opinion the decision of the District Court of Appeal in the case of *Brown* v. *Luddy, supra,* announces principles of law much broader than was necessary to the decision of the legal propositions involved in said case, but in any event, it cannot be said to be authority supporting the position of the defendant here because the factual situation there was entirely different than that which obtains in the case at bar.

The majority opinion also cites the case of *Chicago Quartz Mining Co.* v. *Oliver,* 75 Cal. 194 [16 Pac. 780, 7 Am. St. Rep. 143], as announcing the same principle of law as that enunciated in the cases of *Van Ness* v. *Rooney* and *Brown* v.

*Luddy, supra.* The first mention of the Chicago Quartz Mining Co. case by any of the counsel in the case at bar was on October 9, 1940, when this case was argued for the second time before this court. It was then called to the court's attention by counsel for defendant in an outline of oral reargument. The Chicago Quartz Mining Co. case holds that a patent issued by the United States Government to the Central Pacific R. R. Co. for land included within the boundaries of the grant made to it by the Act of Congress of July 1, 1862, is not conclusive evidence that the land covered by the patent is nonmineral in character, and a person claiming the land under a subsequent mining patent may show that the land is mineral, and therefore excepted from the operation of the grant to the railroad company.

The decision in this case is in direct conflict with the now settled rule that the issuance of a patent to a railroad company under the Railroad Grant Act conclusively determines the nonmineral character of the land that the provision in such a patent excepting mineral land therefrom is void and the title conveyed to the railroad company by such patent is a title in fee to nonmineral land. (*Burke* v. *So. Pacific R. R. Co., supra.*)

It appears from the opinion of this court in the Chicago Quartz Mining Co. case that the mining company there was claiming under patent to a mining claim issued approximately thirteen years subsequent to the patent issued to the railroad company, and there is no statement in the opinion of this court from which the conclusion can be drawn that the claim of the mining company to its mineral location antedated the patent to the railroad company. This case appears to have been decided upon the theory that the railroad company did not get title to the land embraced within its patent because the land involved in the action was valuable gold bearing mineral land, and known to be such at the time of the issuance of the railroad patent. As stated above, the decision of this court in the Chicago Quartz Mining Co. case is in direct conflict with decisions of the Supreme Court of the United States and subsequent decisions of this court. (See *Paterson* v. *Ogden*, 141 Cal. 43 [74 Pac. 443, 99 Am. St. Rep. 31] ; *Jameson* v. *James*, 155 Cal. 275 [100 Pac. 700].)

The majority opinion makes the statement that ''When the Ames tract was finally and definitely located in 1880, its subsurface was not only *known to be mineral* but was subject

to the vested extralateral rights of the adjoining mines.'' I presume this statement must be interpreted to mean that, when the Ames Tract was patented, its subsurface was not only known to be mineral but was subject to the vested extralateral rights of the adjoining miners.

The majority opinion does not, however, state by whom the subsurface of the Ames Tract was ''known to be mineral''. Defendant claims to have known that the Pennsylvania mineral vein underlay the Ames Tract at the time of its patenting. It does not appear, however, that such fact was known to anyone else. There is no doubt that the act granting land to the railroad companies excluded mineral lands. However, the Supreme Court of the United States has held that a secure title to such lands must vest at some time and has set that time as the date of the issuance of patent. It is necessary therefore, at that time, said court has held, that land should be determined actually to be mineral or nonmineral. (*Barden* v. *No. Pacific R. R. Co.*, *supra*; *Shaw* v. *Kellogg*, 170 U. S. 312, 337 [18 Sup. Ct. 632, 42 L. Ed. 1050].) Since the duty of determining the character of land devolves upon the General Land Office, the Supreme Court of the United States has held that the persons to whom the land must be known to be mineral must be the officers of the Land Department in charge of the disposition of public lands. The court recognized that said officers might often from the information available to them determine lands to be nonmineral which in fact contained mineral in quantities sufficient to render the land more valuable for mineral than agricultural purposes; nevertheless it has regarded the settling of the title to land at a definite date to be of such importance that if the land were not shown or known to be such by said officers at the time of patent their determination at said time as to the nonmineral character of the land has, in the absence of fraud, been held thereafter to be conclusive. The Supreme Court of the United States expressed this view in *Barden* v. *No. Pacific R. R. Co.*, *supra*, at page 329, as follows:

''There are undoubtedly many cases arising before the Land Department in the disposition of the public lands where it will be a matter of much difficulty on the part of its officers to ascertain with accuracy whether the lands to be disposed of are to be deemed mineral lands or agricultural lands, and in such cases the rule adopted that they will be considered mineral or agricultural as they are more valuable in the one

class or the other, may be sound. *The officers will be governed by the knowledge of the lands obtained at the time as to their real character. The determination of the fact by those officers that they are one or the other will be considered as conclusive.*'' That a patent is conclusive of the real character of the land even where issued without hearing and determination on that point was settled in the Barden case, *supra,* where Mr. Justice Field said:

''It is true that the patent has been issued in many instances without the investigation and consideration which the public interest requires; but if that has been done without fraud, though unadvisedly by officers of the government charged with the duty of supervising and attending to the preparation and issue of such patents, the consequence must be borne by the government until by further legislation a stricter regard to their duties in that respect can be enforced upon them. The fact remains that under the law the duty of determining the character of the lands granted by Congress, and stating it in instruments transferring the title of the government to the grantees, reposes in officers of the Land Department.''

Likewise, in *Burke* v. *So. Pacific R. R. Co., supra,* at page 709, the court said:

''Taking up the several questions in the light of what we have said, we answer them as follows:

''Did the said grant to the Southern Pacific Railroad Company include mineral lands which were known to be such at or prior to the date of the patent of July 10, 1894?

''Answer.—Mineral lands, known to be such at or prior to the issue of patent, were not included in the grant but excluded from it, and the duty of determining the character of the lands was cast primarily on the Land Department, which was charged with the issue of patents.

''Does a patent to a railroad company under a grant which excludes mineral lands, as in the present case, but which is issued without any investigation upon the part of the officers of the Land Office or of the Department of the Interior as to the quality of the land, whether agricultural or mineral, and without hearing upon or determination of the quality of the lands, operate to convey lands which are thereafter ascertained to be mineral?

"Answer.—A patent issued in such circumstances is irregularly issued, undoubtedly so, but as it is the act of a legally constituted tribunal and is done within its jurisdiction, it is not void and therefore passes the title (*Noble* v. *Union River Logging Railroad* [*Co.*] 147 U. S. 165, 174–175 [37 L. Ed. 123, 13 Sup. Ct. Rep. 271]), subject to the right of the Government to attack the patent by a direct suit for its annulment if the land was known to be mineral when the patent issued. *McLaughlin* v. *United States,* 107 U. S. 526 [27 L. Ed. 621, 2 Sup. Ct. Rep. 862] ; *Western Pacific Railroad Co.* v. *United States,* 108 U. S. 510 [27 L. Ed. 806, 2 Sup. Ct. Rep. 802]." (See also, *West* v. *Standard Oil Co.,* 278 U. S. 200, 211 [49 Sup. Ct. 138, 73 L. Ed. 265].)

"Is the reservation and exception contained in the grant in the patent to the Southern Pacific Railroad Company void and of no effect?

"Answer.—The mineral land exception in the patent is void.

"If the reservation of mineral lands as expressed in the patent is void, then is the patent, upon a collateral attack, a conclusive and official declaration that the land is agricultural and that all the requirements preliminary to the issuance of the patent have been complied with?

"Answer.—It is conclusive upon a collateral attack."

Furthermore, lands must not only be "known" mineral lands, but must be known to be more valuable for mining than for agricultural purposes (*Hunt* v. *Steese,* 75 Cal. 620 [17 Pac. 920]), and abandoned dry shafts on the land or the discovery of mineral in nonpaying quantities will not bring it within the "known" mineral classification. (*Brown* v. *Luddy, supra.*)

The majority opinion states that "The Act, however, cannot be the source of title to any mineral lands. As Justice Fields stated in *Barden* v. *No. Pacific R. R. Co., supra,* the Railroad Grant of July 25, 1866, when it excepted mineral lands meant that title to all mineral lands was to remain in the United States, and no rights to such lands could in any way pass to the railroad."

But one conclusion can be drawn from the above-quoted statement attributed to Justice Field in the Barden case, and that is, that the writer of the majority opinion did not read the whole of said decision. The point which is made in the

Barden case and which the majority opinion seems completely to have ignored or overlooked is, and I solicit indulgence for repetition, that land known to contain mineral in paying quantities may not be patented under said act to the railroads, but that it is recognized that minerals are often not discovered at the time of the issuance of patent, or that the mineral content is not known at that time to be sufficient to classify the lands as being more valuable for mineral than for agricultural purposes; nevertheless, that title cannot be allowed to float around unsettled indefinitely *ad infinitum;* that the time of the issuance of patent is the best time to settle once and for all who shall have title to the land; that in view of the mineral land exception in the granting act, a determination as to the character of land is necessary before patent thereto can issue; that said determination shall be conclusive in order to make the title conveyed by said patent settled and permanent regardless of the fact that minerals might later be discovered therein.

The majority opinion criticizes the citation by plaintiffs of *Burke* v. *So. Pacific R. R. Co., supra, West* v. *Standard Oil Co., supra,* and *Davis* v. *Wiebbold,* 139 U. S. 507 [11 Sup. Ct. 628, 35 L. Ed. 238], as authority for the statement that a patent to railroad land is conclusive as to the agricultural character of the land, stating that these cases concern only the rights of a mining claimant coming into existence *after* the securing of the agricultural patent.

It is true that in *Davis* v. *Wiebbold, supra,* the town-site patent under which defendant claimed the lands in controversy antedated the discovery of minerals therein. The case of *Burke* v. *So. Pacific R. R. Co., supra,* however, did not involve a subsequent discovery of minerals. In said case certain lands were located as mineral claims in 1892. Subsequent thereto on May 9, 1892, the defendant railroad company with knowledge of said prior claims made application to have the same land patented to it under the Railroad Grant Act of July 27, 1866, and the Joint Resolution of 1870. The railroad company made a false affidavit, no notice of hearing was given, and a patent was issued on July 10, 1894. The original mineral claimants failed to perform their assessment work for one year, whereupon the present claimants in March, 1909, relocated said land as placer mining claims. The court held that the government had never brought a

bill in equity to have the patent vacated or annulled, that the time for so doing had expired, that there was no privity between the plaintiffs and the original mineral claimants, that the patent could not be successfully attacked by strangers who had no interest in the land at the time the patent was issued and were not prejudiced by it. It was further held that the patent though issued without investigation on the part of the land officers was conclusive though the land was afterward ascertained to be mineral.

The case of *West* v. *Standard Oil Co., supra,* is authority for the proposition for which it was cited, but itself involves a different question. The Standard Oil Company claimed certain school lands under patent from the State of California. The Act of 1853, granting school lands to the states, made no provision for determining the character of such lands or for the exclusion from the grant of the land found to contain mineral; it did not provide for the issuance of patents; and no patent nor any evidence of title had been issued to the state. The Standard Oil Company contended that the nonmineral character of the land had been established by a final determination in the department. The court held that no final determination as to the character of the land had been made by the department, that no patent had been issued which would imply that a determination as to the character of the land had been made, and that, therefore, the Department of the Interior, had not lost its jurisdiction over the land, and the original inquiry ordered by the Land Department as to the character of the land was subject to a reopening. The cases above cited all stand for the proposition that a patent is conclusive as to the character of the land, but do not all involve situations in which the mining claim came into existence after the securing of an agricultural patent.

The majority opinion states that "a patent, however, issued merely on the basis of an *ex parte* hearing on behalf of the claimant to the land can in no way abrogate the existing vested extralateral rights of parties who had nothing to do with the proceedings." The facts in the cases cited in support of this proposition are not similar to the case at bar, but concern conflicts between mining claimants as to the ownership of extralateral veins. They hold that at the issuance of a patent all surface rights are determined, but that a

patent does not necessarily determine all underground conflicts as between mineral claimants.

In my opinion the evidence in this case is not sufficient to prove that the owners of the Pennsylvania and Jefferson mines had followed their veins extralaterally to a point where they penetrated the Ames Tract at the time of the issuance of patent thereto. Assuming for the time being, however, that such be the case, it seems to me that the fact that the alleged owners of said veins had knowledge of their existence and their location, makes out an even stronger case for the plaintiffs, for they sat idly by and permitted the railroad company to secure a patent to said lands as being nonmineral, when, if said alleged owners had asserted their claim to the same, the railroad company would have been permitted, in fact required, to select lieu lands in their stead —lands to which it *unquestionably* would have obtained a common law fee title extending to the center of the earth— and therefore, defendant should now be estopped to claim that the character of the land to which it now lays claim could not be determined in a mere *ex parte* hearing.

The grants in aid of railroads were not mere gratuities, they were designed to be compensation for the building of roads, and the mining claimants here, by their negligence or indolence let the railroad company take lands which allegedly included their extralateral veins, then causing them to lose their right to select lieu lands in their stead.

It is unfortunate, of course, if the mineral claimants lose a portion of their mineral vein. But it is unfortunate also that the agricultural patentee should suffer. In rendering a decision between the two, it is my opinion that the party who has the knowledge and means of protecting his own rights but slept on them, must be the loser, and not the innocent party who acted to the best of his knowledge and in good faith.

By way of justification for its predecessor's inertia in not protecting the right to which it now lays claim, defendant points out, that adverse proceedings are permitted only in case of surface conflicts; and that protest likewise would not have been recognized because the Land Department has no jurisdiction to determine underground conflicts in the issuance of patents to public lands.

In the first place, adverse proceedings are proper only between rival mining claimants, and, even if that were not true, had defendant's mining claim been located on the railroad land which was open to location at any time prior to patent, the lands would have been removed from the grant and such proceedings would have been unnecessary. Since notice by publication must be given before patent is issued, defendant's predecessor had at least constructive knowledge that such patent was about to issue and counsel for defendant do not negative that fact in their briefs. Having knowledge of the extension of its vein under the plaintiffs' land, and notice that a nonmineral patent was about to issue thereon, defendant's predecessor then had two avenues by which it might have protected its extralateral right. It might either have entered upon the railroad land and located a mineral claim thereon prior to patent, or it might have "protested" the issuance of the patent to the railroad company. That *protesting the issuance of patent is* a proper method of securing a determination as to the character of land is well borne out by the following authorities:

According to Costigan on Mining Law (p. 387), "a protest may be filed at any time prior to the issuance of patent by any person who alleges a state of facts which should prevent the issuance of a patent. Except in the case of an excluded co-owner, the office of a protest is to show that the land claimed is not the kind it is represented to be, or that the applicant has failed to comply with the law in a matter which would avoid the claim."

Quoting from Lindley on Mines (3d ed.), at page 1752, I find the statement that:

"Often a protestant is a mere volunteer, an *amicus curiae,* who calls the attention of the department to an alleged noncompliance with the law on the part of the applicant, which otherwise might be overlooked, *or raises the issues as to the character of the land,* in the ultimate determination of which issue the protestant may or may not have an interest proximate or remote;" and on page 1757, in discussing section 2325 of the Revised Statutes [30 U. S. C. A. 29], said authority states:

"While controversies over the character of the land are not subjects of adverse claims under the sections of the Revised Statutes under consideration, they are, however, the

subject of protest in any proceeding where title to public land is sought to be acquired, and where such issue is raised, it is the duty of the department to see that the lands are disposed of according to the law governing the quality of the lands under consideration.''

In the case of *German Ins. Co.* v. *Hayden*, 21 Colo. 127 [40 Pac. 453, 52 Am. St. Rep. 206, 210], after quoting section 2325, United States Revised Statutes, to the effect that no objection to the issuance of a patent shall be heard ''except it be shown that the applicant has failed to comply with the terms of this chapter'', the court said:

''The standing of the protestant seems to be regulated by the exception in the paragraph last quoted. The statement that he is not a party and therefore not entitled to appeal, is immaterial to the real question at issue. The law does not knowingly permit a claimant to obtain patent under the mineral laws to agricultural lands, and, when a patent is applied for, it is quite unimportant as to how the attention of the land department may be called to the character of the land sought to be patented. That department certainly has the right to make necessary rules governing the manner in which the character of the land shall be made to appear both *prima facie* and ultimately, and if these rules are not complied with, or if it appears that the land is not such as can be entered under the particular claim advanced, as for instance, where agricultural lands are applied for under the mining laws, it is not only the province but the duty of the land department to deny the entry. It should be unnecessary to cite authorities in support of the foregoing, but as the contrary has been seriously urged in this case, we cite the following cases: *Lindsey* v. *Hawes*, 2 Black, 554 [17 L. Ed. 265]; *Pierce* v. *Frace*, 2 Wash. 81 [26 Pac. 192, 807]; *Harkness* v. *Underhill*, 1 Black, 316 [17 L. Ed. 208]; *McArthy* [*McCarthy*] v. *Main* [*Mann*], 19 Wall. 20 [22 L. Ed. 49].)''

If defendant's predecessor had taken advantage of either of the two methods open to it to preserve its claims, the railroad company would also have been protected, for upon withdrawal of the Ames land from its grant, the company would have been entitled to select other lands in lieu of those withdrawn. But, the mining company, having knowledge of the existence of the vein which it claimed, made no attempt

to protect its claim. By this neglect it deprived the railroad company of the lieu lands which it might have selected, and now asserts that it is the owner of the vein which underlies the surface of the railroad company's land. I can reach but one conclusion from these facts, that the defendant's predecessor slept on its rights and that defendant now is estopped to come in and claim them to the detriment of the plaintiffs.

Let us assume an illustration for the purpose of demonstrating a situation which might exist if the position contended for by defendant and adopted by the majority opinion is correct.

"A" locates a mining claim on unpatented land. Shortly thereafter, "B" files an application for a homestead on a quarter-section of land adjacent to "A's" mining claim. "A" proceeds to develop his mining claim and "B" his homestead. "B" proves up on his homestead and obtains a patent thereto from the government. "A" files no contest or protest against the patenting of the land to "B". Years after "B" obtains his patent, "A" finds that in following the vein which apexed on his mining claim, it penetrates "B's" agricultural land. The extraction of ore from this vein on "B's" land, may or may not interfere with the use and enjoyment of "B's" land.

Query. As a matter of justice and equity or even public policy, should "A" be permitted to mine and extract gold from "B's" land, which had been conclusively determined to be nonmineral land at the time patent was issue to "B"?

Answer. I think not. I believe that a rule more consonant with justice and equity would require "A" to pay "B" for the privilege of mining on "B's" land if sufficient gold is found thereon to justify mining operations. The fact that "A" located his mining claim before "B" filed his homestead application, should not give "A" the right to follow the dip of a vein apexing on his mining claim into "B's" agricultural land. The situation presented in the case at bar is substantially the same as that contained in the above illustration, and I am not persuaded that there are any considerations of equity, justice, or public policy, to justify the extension of the extralateral right doctrine so as to permit the owner of a vein apexing on a mining claim to follow the same on its dip into land conclusively determined to be non-

mineral land even though such determination is made after the discovery and location of the mining claim on which said vein apexes.

The doctrine of extralateral rights is well recognized between mines and mining proprietors. As between them, I do not mean to disturb long established rules. On the other hand, such extralateral right is purely statutory. The common law would give to each claimant all ore bodies beneath the surface of his tract. It is a special privilege or exceptional right which is conferred by statute as an incidental of a valid lode location. It is my view that such special right should be confined and limited to the field in which it was intended to operate and in which it creates no injustice because of its reciprocal character.

As to mining proprietors, each takes his property anticipating that veins apexing thereon may extend extralaterally into the land of others, and that the veins of others may in like manner pierce his boundaries. But the agricultural patentee expects to acquire a common law fee in his land conferring complete ownership therein to the center of the earth. Therefore, those who claim extralateral rights in public lands which are being patented as nonmineral lands owe a duty to inform the General Land Office of said claim.

I do not mean to say here that owners of mining claims are put on notice to protect their extralateral vein from everyone who seeks to patent the land which overlies them. As to mining patentees, that is, of course, unnecessary. However, the means of ascertaining the extent and direction of his mineral veins, if not the actual knowledge, is within the power of the mineral claimant. It is upon him therefore that there devolves the duty of giving notice to the General Land Office about to issue a patent conveying a common law fee to the land overlying said veins that he claims a mineral right therein and that a nonmineral patent thereto should not issue, unless, of course, by some specific agreement the extralateral rights therein are to be excepted or reserved.

In view of the fact that most grants of public lands except mineral lands, and mineral rights therein may be protected by the methods hereinabove mentioned, no great hardship is inflicted upon mining claimants by requiring them to notify the Land Office of their claims and thus prevent unin-

tentional error on the part of the government officials, and hardship to innocent purchasers of agricultural lands.

The majority opinion states: "The subsurface of the Ames tract being clearly mineral could not pass under the terms of the Act *but remained in the Government,* and the Pennsylvania and Jefferson mines received full extralateral rights to mine therein by virtue of the Mining Act of July 26, 1866." The majority opinion further states: "It is well established that the government cannot convey away land which it no longer owns and that a patent cannot cut off previously existing vested rights in the patented property." It is obvious that the last statement quoted above is in direct conflict with the first quoted statement; that is, in the first statement above quoted, the majority opinion states that the title to the mineral bearing subsurface of the Ames Tract remained in the government at the time it conveyed the Ames Tract to the railroad company, and in the last statement quoted above the majority opinion states that such mineral bearing subsurface had already vested in the owner of the mining claims.

The case of *Reynolds* v. *Iron Silver Mining Co.,* 116 U. S. 687 [6 Sup. Ct. 601, 29 L. Ed. 774], cited by the majority opinion as authority for the last statement quoted above, is not helpful because the court therein decided under a statute which provided that where a vein or lode was known to exist within the boundaries of a placer claim, application for patent which did not include application for the vein or lode should be construed as a declaration that the claimant had no right of possession of the vein or lode claim, that the jury already had determined that the patentees of the placer claim knew at the time of application for patent of the existence of the lode and did not claim the lode in said application and therefore were precluded from subsequently exerting title thereto.

The fundamental error in the majority opinion is that it in effect holds that the government reserved the mineral in the Ames Tract when it conveyed the same to the railroad company. This holding is contrary to all of the decisions rendered by the Supreme Court of the United States in the past eighty years and to all of the decisions of this court with the exception of the cases of *Van Ness* v. *Rooney, supra, Brown* v. *Luddy, supra,* and *Chicago Quartz Mining*

*Co.* v. *Oliver, supra,* which, as pointed out hereinabove, were decided upon a theory which has been disapproved by the Supreme Court of the United States.

If both tracts of land had been mineral, it is elementary that each would have had the right to follow into the lands of the other, the extralateral dip of veins which apexed within their respective boundaries, and this without regard to the priority of the patents. But the reciprocal right to so follow mineral veins extralaterally is characteristic of mineral lands only.

That mineral veins extending extralaterally may not be followed into lands conveyed by prior agricultural patents has already been determined. The Supreme Court of Oregon in *Reeves* v. *Oregon Exploration Co.,* 127 Or. 686 [273 Pac. 389, 391], commented on the right to follow an extralateral vein into agricultural lands previously patented under the Timber and Stone Act of June 3, 1878, in the following manner:

"We find no merit in the contention that defendant has the same right to follow its vein under the surface of plaintiffs' land that it would have had if plaintiffs' land had been acquired under the mining laws. The right of a junior lode claimant, whether his claim be patented or unpatented, to follow the dip of his vein into an adjoining patented or unpatented lode claim, is one which arises under the mining laws, and is confined to titles acquired under the mining laws, and has no application to a case where the vein of a lode claim on its dip extends into lands the title to which has been acquired under agricultural patents. Between lode claimants the right of one to pursue his vein on its dip under the surface of the other is recognized by the courts. See Lindley on Mines (3d ed.), sec. 611, and authorities cited. But such right is not recognized by the courts as between a lode claimant and an agricultural claimant, whose title was acquired under a grant made prior to the location of the lode claim. We think that this particular question is settled by the decision of Judge Sawyer in *Amador-Medean Gold Min. Co.* v. *South Spring Hill Gold Min. Co.* (C. C.), 36 Fed. [668], 669, 13 Sawy. 523. The doctrine announced in that case has been recognized as the law for more than 50 years and we have been cited to no case holding to a

contrary doctrine.'' (See, also, *Anaconda Copper Mining Co.* v. *Pilot-Butte Min. Co.*, 52 Mont. 165 [156 Pac. 409].)

To my mind, the whole fallacy of the majority opinion lies in the fact that it ignores the sanctity of a patent and the security which the obtaining of a patent is supposed to give a patentee.

I believe, there is nothing more important in our economic system than the certainty of the title under which real property in private ownership is held. Rules applicable to the determination of such titles should be so entrenched in our legal and economic systems that they should not be subject to change or variation or rendered uncertain by judicial decision of this or any other court. When a person receives a conveyance of land predicated upon a patent issued by the government of the United States containing no reservations or restrictions, he should be able to rest secure in the belief that he is the owner of such land and that his right to exercise all of the incidents of ownership, occupation, possession and use thereof cannot be challenged by anyone not in privity with his legal or equitable title. If the majority opinion in this case is permitted to stand, it will remove from the arch of title structure the keystone which renders that structure safe and secure.

It has long been the policy of the courts of this state and of the Supreme Court of the United States to recognize the sacred title of a patentee. The Supreme Court of this state has many times reiterated its policy to regard as final and certain a title acquired by patent. (See *Saunders* v. *La Purisima etc. Co.*, 125 Cal. 159 [57 Pac. 656].) And in *Gale* v. *Best*, 78 Cal. 235, at 239 [20 Pac. 550, 12 Am. St. Rep. 44], this court quoted with favor the words of Justice Field, in the case of *Steel* v. *St. Louis Smelting & Ref. Co.*, 106 U. S. 447 [1 Sup. Ct. 389, 27 L. Ed. 226] :

''In *Steel* v. *Smelting Co., supra,* Justice Field, whose exhaustive opinion we cannot here undertake to reproduce, among other things, says as follows :

'' 'We have so often had occasion to speak of the Land Department, the object of its creation, and the powers it possesses in the alienation by patent of portions of the public lands, that it creates an unpleasant surprise to find that counsel, in discussing the effect to be given to the action of that department, overlook our decisions on the subject.

That department, as we have repeatedly said, was established to supervise the various proceedings whereby a conveyance of the title from the United States to portions of the public domain is obtained, and to see that the requirements of different acts of Congress are fully complied with. Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, *the nature of the land,* and whether it is of the class which is open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable except by direct proceedings for its annulment or limitation. Such has been the uniform language of this court in repeated decisions.' *And again, speaking of the lands held by the possessor of a patent, he says: 'If intruders upon them could compel him, in every suit for possession, to establish the validity of the action of the Land Department and the correctness of its rulings upon matters submitted to it, the patent, instead of being a means of peace and security, would subject his rights to constant and ruinous litigation.* He would recover one portion of his land if the jury were satisfied that the evidence produced justified the action of that department, and lose another portion, the title whereto rests upon the same facts, because another jury came to a different conclusion. So his rights in different suits upon the same patent would be determined, not by its efficacy as a conveyance of the government, but according to the fluctuating prejudices of different jurymen, or their varying capacities to weigh evidences.' (104 U. S. 636, 641.) And the pith of the whole matter is aptly expressed by the same learned justice in *Smelting Co.* v. *Kemp,* 104 U. S. 636 [26 L. Ed. 875], where, speaking of the land department, he says: 'Indeed, the doctrine as to the regularity and validity of its acts, where it has jurisdiction, goes so far that if in *any circumstances under existing law* a patent would be held valid, it will be presumed that such circumstances existed.' "

If the rule that patents to railroad lands are conclusive as to their nonmineral character were otherwise, to quote from Judge Farrington's decision in *Southern Development Co.* v. *Endersen,* 200 Fed. 272, 275:

"A title which today is valuable because the land is apparently non-mineral tomorrow may become utterly void and worthless by reason of the discovery of mineral. Methods of

extraction and reduction may be devised of such cheapness and efficiency as to render mining highly profitable on lands which at the date of selection and listing, had and could have had no value for mineral purposes. The courts have never yielded to the argument that Congress intended to provide for titles so elusive.''

Therefore the answer to the statement in the majority opinion that title to the vein underlying the Ames Tract had passed out of the hands of the government into the hands of mining locators is that that question was determined adversely to said locators by the issuance of the patent to the railroad company. If we do not take this view we place the patentee of land in the situation so roundly condemned by Justice Field in the case of *Steel* v. *Smelting Co., supra,* where ''his rights . . . upon the same patent would be determined, not by its efficacy as a conveyance of the government, but according to the fluctuating prejudices of different jurymen,''
. . .

That the patent so issued determined the mining locators' claims adversely to them is supported by the case of *Thomas* v. *Horst,* 54 Mont. 260 [169 Pac. 731]; wherein a patent was issued to a railroad company subsequent to the location of quartz mining claims upon the same land. Instead of determining the character of each parcel of land at the time of patent, the character of all lands granted to the railroad company therein were classified by a commission under authority of an act of Congress, and notice of such classification was published prior to the issuance of patent. If no protest was filed, the classification was declared to be final except for fraud. This classification was held to have the same legal effect as a determination at the time of patent such as that held in *Barden* v. *No. Pacific R. R. Co., supra,* to be conclusive.

The court then said, ''If lots 1 and 2 outside the limits of the Homestake claim were classified as nonmineral, and no protest was filed, or if protest was filed and, after hearing, was overruled, such classification, in the absence of fraud, became final, and settled for all time that the land was in fact nonmineral in character. . . .

''If we indulge the presumption declared by the Supreme Court that the issuance of patent is in the nature of a judicial determination, that every fact has been found which is neces-

sary to entitle the patentee to the legal title to the land, the conclusion appears inevitable that the allegation in this complaint that patent issued to the Northern Pacific is tantamount to an allegation that the land in controversy was duly classified as nonmineral, and the classification approved before the mineral claims were located and since the determination of the mineral or nonmineral character of the land presented a question of fact for decision by the land department, its judgment thereon is conclusive upon the courts in the absence of fraud.

"Of course, if the mineral or nonmineral character of this land was open to investigation notwithstanding its classification, then the allegation in the complaint that it was and is mineral land is sufficient to show that the land department was without jurisdiction to convey it to the railway company; but, as we have observed before, if the classification did not finally determine the character of this land, the utmost that can be said of it is that it was an idle ceremony, and the act of February 26, 1895, was a meaningless piece of legislation."

In conclusion, I desire to summarize the principles of law, which in my opinion are applicable to the case at bar, and which, when applied to the facts of this case must result in a reversal of the judgment of the trial court in so far as it grants to the Pennsylvania mining claim extralateral rights in the Ames Tract.

The Railroad Grant Act of July 25, 1866, created a present grant of nonmineral land to the railroad company; that is, the grant took effect as of that date, if and when the railroad company complied with the provisions of the act with reference to the location and construction of a railroad and filed its map of location with the General Land Office. The grant of such land remained a float until the filing of such map, and title thereupon vested in the railroad company subject to the determination by the General Land Office as to whether or not said land was mineral or nonmineral in character. If the Land Office determined that any of the land covered by the grant was mineral in character, the same was excluded from the grant, and the railroad company was given other nonmineral land in lieu of the mineral land so excluded. If the Land Office determined that the land covered by the grant was nonmineral, and a patent was issued to the railroad com-

pany, the issuance of such patent conclusively determined the nonmineral character of the land, and the railroad company got a common law fee in the land granted, including all mineral deposited therein. Unless discovery of mineral in paying quantities was called to the attention of the government officials before patent was issued to the railroad company, all claims to the mineral in such land was cut off by the issuance of such patent. The provision in a patent issued to a railroad company excepting mineral or mineral land from the grant was and is void, and the railroad company was granted a common law fee including all mineral deposits in the land upon the issuance of the patent.

A valid mineral location gives to the locator the right to follow extralaterally on their dip downward all veins apexing on his claim which penetrate other mineral lands, but extralateral rights do not exist in agricultural or nonmineral lands.

When the Land Office determined that the Ames Tract was nonmineral in character and the government issued a patent thereto to the railroad company, the latter was granted a common law fee in said land which related back to the date of the passage of the Railroad Grant Act of July 25, 1866, and cut off all intervening rights of those asserting that said land was more valuable for mineral than nonmineral purposes. The defendant therefore is barred from asserting the right to extract mineral from the Ames Tract upon the theory that it may do so under the extralateral right doctrine.

Defendant admits that the Jefferson title is not as ''clear cut'' as that to the Pennsylvania, but argues that once said title was in existence, it will be presumed to continue so until the contrary is proved. Although the Jefferson claim was relocated in 1891, and subsequently disputed by various claimants, defendant states that it has acquired by various options and deeds or leases the rights of those rival claimants. In further defense of its right to mine on the Jefferson vein, defendant offers the ''Ebert reservation'', of which it is the assignee.

I find it unnecessary to give further consideration to the contentions of either party so far as the Jefferson claim is concerned, for the reason that the conclusion which I have reached as to defendant's right to follow extralaterally the dip of the vein apexing on the *Pennsylvania claim is equally applicable to that of the Jefferson claim.*

The right of the defendant to follow the Jefferson vein on its dip under the Ames land is finally determined, however, upon a reservation in the deed from Ebert to Ames hereinabove referred to as the "Ebert reservation". Under this reservation, Ebert reserved to himself, his successors and assigns, "the right to follow the Jefferson gold quartz ledge with its dip, and to mine and extract the ore from the same in and upon said (the Ames) land, without disturbing the surface of said land". I am of the opinion that by this reservation, Ebert retained the right to follow the Jefferson vein under the surface of the Ames land, and that this right was transferable.

By mesne conveyances, defendant succeeded to the rights of Ebert under this reservation. Although it cannot be said that defendant did thereby acquire an estate in the lands of the plaintiffs, it did obtain the right to remove the ore from said vein and title to the ore so mined. Since a right carries with it the incidents necessary to its exercise, defendant has a right of entry which constitutes a complete and ample defense to this action.

Whether or not such right is exclusive is a matter of interpretation depending in part on the intention of the parties and the surrounding circumstances at the time of the grant. For the present, in the absence of evidence, I deem it neither necessary nor proper to reach a determination on that point.

In view of the conclusion which I have reached in the foregoing opinion, the judgment of the trial court should be reversed.

A petition for a rehearing was denied February 27, 1941. Carter, J., voted for a rehearing.